[Civ. No. 11914.   First Dist., Div. One.   June 29, 1942.]

THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES (a Corporation), Plaintiff and Appellant, v. CHARLES G. JOHNSON, as State Treasurer, etc., Defendant and Appellant.

Pillsbury, Madison & Sutro, Felix T. Smith, Leland B. Groezinger and Scott C. Lambert for Plaintiff and Appellant.

Earl Warren, Attorney General, and Valentine Brookes, Neil Cunningham and H. H. Linney, Deputies Attorney General, for Defendant and Appellant.

PETERS, P. J.—Plaintiff insurance company brought this action to recover taxes paid under protest to defendant State Treasurer. The amended complaint prayed for a total refund of $330,348.22. At the time of trial plaintiff dismissed a portion of its claim amounting to $32,002.62, leaving in issue its claim for a refund in the amount of $298,345.60. The trial court, by its judgment, determined that plaintiff was entitled to a refund of $17,443.66. From this judgment both the insurance company and the State Treasurer appeal, plaintiff claiming it is entitled to a refund of the total amount claimed, and defendant claiming that plaintiff is entitled to no refund at all.

The tax here in controversy is provided for by article XIII, section 14 (b) of the Constitution. The section was added to our Constitution in 1910 and reads as follows:

"Every insurance company or association doing business in this state shall annually pay to the state a tax of one

and one-half per cent upon the amount of the gross premiums received upon its business done in this state, less return premiums and reinsurance in companies or associations authorized to do business in this state. . . ." Section 14 was materially amended in 1933, and again in 1938, but, so far as the problem here presented is concerned, the language of this portion of the section has not been materially changed.

It will be noted that under the constitutional provision the tax is imposed on "every insurance company . . . doing business in this state" and is levied upon "gross premiums received upon its business done in this state, less return premiums. . . ."

This litigation involves the tax payable by plaintiff in the year 1935, predicated upon business transacted in this state during the calendar year 1934. It was stipulated that in 1935 the State Board of Equalization assessed and levied a tax against plaintiff of $490,584.14 and that included therein were taxes of $298,345.60 based on the amounts received during 1934 by plaintiff as considerations for annuity contracts sold by it in California. On plaintiff's appeal the sole question presented is whether the considerations received by it upon the sale in California of annuity contracts are taxable under the above quoted constitutional provision. This turns upon whether such considerations can properly be considered as "gross premiums received upon its business done in this state" as those terms are used in the constitutional provision. The trial court held that such considerations were part of plaintiff's "gross premiums" and were therefore taxable.

It was also stipulated that during the calendar year 1934 plaintiff paid refunds and cash values to holders of annuity contracts residing in California in the sum of $670,909.94. The trial court held that these refunds and cash values were "return premiums" as those terms are used in the constitutional provision above quoted, and held that the tax on the same, amounting to $17,443.66, should be refunded. It is from this portion of the judgment that defendant appeals.

*Appeal of Equitable Life Assurance*
*Society of the United States.*

As already indicated, plaintiff paid the questioned tax under protest, and brought this action for a refund. The

trial court overruled the demurrer of defendant, indicating that he then believed that the complaint, prima facie, stated a cause of action and that the case should go to trial where evidence of contemporaneous construction of the constitutional provision could be introduced. Although the parties stipulated to many facts, a protracted trial was had to determine the proper construction of the section, and to determine whether there had been a contemporaneous construction of the section by the taxing authorities. On the basic questions presented to it the trial court found:

"VI

"That at the time of the adoption of Article XIII, Section 14(b) of the Constitution of California in the year 1910, the word 'premium' was used by various life insurance companies and others to describe the consideration for annuity contracts; that at that time, prior thereto, and ever since, and now, life insurance companies have engaged and do now engage in the business of writing such annuity contracts, and that the business of writing such annuity contracts has ever since been and is now one of the recognized businesses in California in which life insurance companies as such were and are authorized to engage."

"VII

"That since the adoption of said Article XIII, Section 14(b) of the Constitution of California, life insurance companies have been at all times required by law to make and file annually with the Insurance Commissioner of the State of California a report or return showing the total amount of gross premiums received from business done in this state; that the several Insurance Commissioners since the adoption of said Article XIII, Section 14(b), have at all times required life insurers to include in such return of their gross premium receipts for taxation purposes the considerations or premiums received from the issuance and sale of annuity contracts in the State of California; that prior to and since the adoption of said Article XIII, Section 14(b), of the Constitution, the several Insurance Commissioners have construed said Article XIII, Section 14(b), of the Constitution of California as requiring the inclusion of such annuity premiums as a part of their return of gross premiums from business done in this State upon which the tax is authorized to be levied by said constitutional provision."

On this appeal the contending parties each rely on two main lines of argument. Plaintiff contends that the word ''premiums'' as used by insurance companies, by people connected therewith, and by the public generally, in 1910, did not include the considerations paid for annuity contracts. Defendant makes the opposite contention, it being his position that the consideration paid for an annuity contract is commonly referred to by experts and by the public as a ''premium,'' and that the term should be so construed in the constitutional provision here in question.

Plaintiff next contends that, if the word, as used in the constitutional provision, is ambiguous, the ambiguity was removed by administrative interpretation both before and after the adoption of the constitutional provision, and that this contemporaneous construction should control. Defendant seeks to demonstrate in his brief that the administrative authorities never construed the tax provision as not applying to the consideration paid for annuities.

The problem as to whether a tax on ''premiums'' includes a tax on the consideration paid for an annuity, while never before directly presented in this state, has been presented to the appellate courts of several of the states. An examination of those cases shows that they are in hopeless conflict with strong dissenting opinions in each line of authority. These cases will be referred to later in this opinion, reference now being made to the conflicting lines of authority for whatever weight such fact may have in determining whether the term is ambiguous.

As already indicated, the trial court found on the disputed question of administrative construction that since the adoption of the constitutional provision the various insurance commissioners had at all times required life insurers to include in their return of gross premiums the considerations received from the issuance of annuity contracts, and that prior to, and since, 1910, the several insurance commissioners construed the provision as requiring the inclusion of annuity premiums.

Plaintiff refers to a discussion between court and counsel with regard to this finding which it seeks to construe in its favor. During a discussion over the settlement of findings the trial court expressed some doubt as to whether such a finding should have been made, and finally stated: ''In other words, I don't think there is any real conflict on either ques-

tion, although I do appreciate that the Courts have held that conflicting inferences may be drawn from the same facts." Plaintiff suggests that this finding was outside the issues, and contends that the evidence shows incontrovertibly that the contemporaneous administrative construction was opposed to the finding, and interprets the above statement of the trial court as supporting that contention. Such interpretation is not correct. It is quite clear that the trial court meant that a "finding" on this issue had no place in the findings because it believed that there was no conflict in the evidence as to the interpretation of the commissioners, which interpretation was to the effect that considerations paid for annuities must be included as "premiums"; that the legal effect of such administrative interpretation in fixing the meaning of the constitutional provision was a question of law, and did not involve a resolution of a conflict in the evidence. Certainly, the trial court did not indicate that it believed the finding was opposed to the evidence.

As to the finding being outside the issues, it is quite clear that contemporaneous construction is a guide to the interpretation of a doubtful statute. A finding as to such construction in the present case would be without the issues only if the present provision can be said to be free from ambiguity. Of course, each party to this appeal contends that it is free from ambiguity, each ascribing a different meaning to the term. In view of the contrariety of decisions, and prevalence of dissenting opinions in each line, it seems quite clear that the meaning of the term is not entirely free from doubt.

Before directly discussing the proper meaning of the provision in question some reference must be made to its background and to related statutory provisions. Prior to 1910 insurance companies were taxed by statute, the tax being based on a percentage of "gross premiums." (Stats. of 1903, p. 359; Stats. of 1905, p. 136.) The constitutional provision here in question was adopted in 1910 as part of a rather broad revision of the tax structure. The report of the Tax Commission indicates that, so far as the insurance company tax is concerned, the constitutional amendment was not designed to make a change in the existing system. Plaintiff contends that before the provision was placed in the Constitution it had acquired a well-defined meaning which excluded the consideration paid for annuities from

the category of "premiums," and contends that the presumption is, that the provision, when placed in the Constitution, was intended to have the same meaning.

■■ It is quite clear that an annuity contract differs from a life insurance contract. The risk is fundamentally different in the two contracts. In a life insurance policy the risk assumed is to pay upon the assured's death; in a pure annuity contract the risk assumed is to pay as long as the assured may live. But, although an annuity contract is not a life insurance contract, it is equally clear that the sale of annuity contracts in California is part of the business done by insurance companies. In fact, only insurance companies may engage in the sale of annuities in this state. As early as 1913 the attorney general of this state ruled that in order to qualify for the purpose of selling annuities, a company had to qualify as an insurance company. This opinion is undoubtedly in conformance with past and existing statutory provisions. Section 594 of the Political Code as originally enacted in 1907 (Stats. of 1907, p. 141) classified "all insurance business" in this state into "thirteen kinds." The first subdivision then read as follows: "Life insurance business, including endowments and annuities. . . ." Although that section has frequently been amended, substantially that same language has remained in the law since 1907. In 1935, section 594 of the Political Code was repealed and its provisions carried into the Insurance Code. (Stats. of 1935, p. 496.) As amended in 1939 (Stats. of 1939, p. 2637), section 100 of that code divides insurance into twenty classes, of which section 1 is life insurance. Section 101 reads: "Life insurance includes insurance upon the lives of persons or appertaining thereto, and the granting, purchasing, or disposing. of annuities." (See, also § 2762, Civ. Code, now § 10170, Ins. Code.) This statutory classification makes it clear that in this state the selling of annuities is part of the "business done in this state" by life insurance companies as such terms are used in article XIII, section 14(b). ■■ If the tax imposed by the Constitution were simply on "business done in this state" by insurance companies there could be no doubt at all but that the considerations received upon the sale of annuities would be taxable. But the constitutional provision is more limited. It does not impose the tax on all business done by insurance companies in this state, but only on the "gross

premiums received upon its business done in this state.'' It is obvious that the constitutional provision did not intend to tax all receipts of insurance companies. It is not a gross receipts tax. Income from rentals, investments, etc., is obviously not included. But it seems equally clear that it was the intent of the constitutional provision to tax all receipts that could reasonably be classified as ''premiums.'' With this obvious purpose in mind we turn then to the question as to whether the term ''premiums'' reasonably includes considerations received on the sale of annuity contracts.

■ Plaintiff urges that the term ''premiums'' technically, historically and generally refers only to the consideration received upon the sale of a life insurance policy. In its opening brief it makes the statement: ''Historically, also, the word 'premium' means a compensation paid for *insurance*. As used by legal writers, the compensation for an annuity is never termed a 'premium,' but is spoken of consistently as the 'consideration.' '' (App. Op. Br., p. 6.) Again at page 36 of that brief appears the following: ''At the time of the constitutional amendment of 1910, and for centuries before that, neither the general public, nor legislators, lawyers, nor judges used the word 'premium' to designate the consideration for an annuity.'' If these statements were borne out by the record they would constitute a complete justification for plaintiff's position, and require a reversal. But the plain fact is that such statements are in direct opposition to what the record here shows. A considerable portion of defendant's case was devoted to demonstrating that in 1910, and prior and subsequent thereto, life insurance companies, their actuaries and agents, authors of legal texts, and judges and authors of insurance texts, referred to the consideration paid for an annuity as a ''premium.'' Several hundred pages of transcript are devoted to that sole purpose as are many of the exhibits. In view of this overwhelming showing, the statements above quoted are simply contrary to the evidence.

Space does not permit an exhaustive reference to the many exhibits introduced or read into evidence by defendant on this issue. A few will suffice to demonstrate the point. Defendant's exhibit 26 was an excerpt from ''Practical Lessons in Actuarial Science'' (2d ed., 1905), by Miles Dawson, a recognized authority in the insurance field. In a chapter headed ''Definition of 'Premium' '' Mr. Dawson

states: "The Institute of Actuaries' Text-Book defines Premium as follows: 'The sum, whether single or periodical, which is payable in consideration of a benefit, is usually called a premium.' This definition does not include the idea that the premium must be sufficient or at least equal to the present value of the benefit, nor indeed does that idea properly enter into the definition of the word. The distinction is all the more important as the actuary in his ordinary work is engaged in finding present values of *sufficient* premiums and thus always has the question of the sufficiency of a premium in view. It is beyond question, however, that a sum of money paid and received in consideration for an insurance, endowment or annuity is a premium, whether it be sufficient or not from an actuarial standpoint. A very simple definition would seem to be: 'A premium is the price of an insurance, endowment or annuity.'" Defendant has collected on pages 21 to 30 of his brief quotations from eight or nine recognized text books in the insurance field, some written prior to 1910 and some subsequent thereto, all referring to the consideration paid for an annuity as a "premium." In Blackstone's Commentaries, Book II, page 461 (Lewis' edition) appears the following: "Thirdly, the practice of purchasing *annuities for lives* at a certain price or premium, instead of advancing the same sum on an ordinary loan, arises usually from the inability of the borrower to give the lender a permanent security for the return of the money borrowed, at any one period of time. . . ."

In the Encyclopedia Britannica published in 1907 there is an article on "Annuities" and many examples of how they are computed in which the consideration for an annuity is referred to as the "annual premium."

There were introduced into evidence by defendant several booklets of the Actuarial Society of America published in 1905, 1907, 1908 and 1910. These exhibits contain questions given in examinations by the society to applicants for membership. In many of the questions therein referring to annuities the consideration therefor was designated as a "premium." Rate books of various insurance companies doing business in California prior and subsequent to 1910, including some of plaintiff's, were admitted in evidence. In practically all of these rate books, including some introduced by plaintiff, the consideration for an annuity was referred to as a "premium." Professor Mowbray, an out-

standing authority in the insurance field, and consulting actuary for the Insurance Commissioner, and who was a full-time actuary with that department from 1908-10, when asked what was generally the term applied to the consideration paid to insurance companies for annuities at or about 1910, testified: "As I recall the books and articles that were written prior to that time, and having to rule out some that I have been familiar with since, the terminology varied somewhat. The term 'premium' was sometimes used; the term 'value of annuities,' particularly in technical actuarial work, was used; and in some instances 'consideration'; but my recollection is that the more common use was to designate it as 'premiums.' " This was based on information gained from insurance texts, rate books, etc. He also testified that he had examined several books, popular and technical, written about that period and that he was quite sure that he did not find one in which the word "premium" was not used in connection with annuity contracts. Mae Barr Long, deputy Insurance Commissioner since 1923 and who has been connected with the department since 1906, testified that in all rate books she examined prior to 1910 compensation for annuities was always referred to as a "premium."

In addition to this exhaustive and convincing proof as to the meaning of the term "premium" at or about 1910, and later, the parties stipulated that the tax here involved was imposed upon considerations received on certain designated types of policies which were attached to the stipulation. There are several very interesting facts about these policies. In the first place, nearly every one of them refers to the consideration to be paid as a "premium." In the second place, almost all the policies had incorporated therein a life insurance feature. A few examples will suffice to demonstrate the point. The first policy introduced is called a "Retirement Annuity." Throughout that form the consideration for the policy is referred to as a "premium." On the outside of the specimen policy appears "Life Annuity beginning at age 65 of $79.00 per month. Number of Premium Units:—Two; Age at Issue 35; Annual Premium $200.00. . . . Premiums payable until commencement of annuities." The contract entered into is to pay the annuitant a specified number of monthly payments beginning at a specified age. In giving the annuitant various options, the phrase "provided premiums have been duly paid" several

times appears. In the event the annuitant dies before any payments are made, a minor life insurance feature is incorporated in the policy.

The next policy introduced was called a "Cash Refund Annuity." While it has no life insurance features, on the outside of the policy appears "Single Premium, Non-Participating."

The third policy — Exhibit C — is a deferred annuity. It has a column headed "Annual Premium"; and another "Annual Premium Payable for .... Years", and provides that in case of death of annuitant prior to the date of the first annuity payment "all premiums paid hereon" shall be refunded to a designated person. It also provides that annuity payments are in consideration of a designated number of "full years' premiums." A grace of thirty-one days "will be granted for the payment of every premium. . . ." In several other places the consideration paid for the policy is described as a "premium." An insurance feature is a part of this policy.

In all but one of the specimen policies a similar situation prevails. They all consistently refer to the consideration paid by the purchaser as a premium and nearly all of them have incorporated in varying degrees a life insurance feature.

While it is true that these are policies issued in 1934 (the year here in question) and not the policies issued in 1910, they are some evidence of what this plaintiff now considers the proper interpretation of the word under construction.

In the face of this evidence, it is obvious that the term "gross premiums," as used in the constitutional provision, is, to say the least, capable of the interpretation that it includes the consideration paid for an annuity. It is true that plaintiff refers to several dictionary definitions of the term "premium" (Webster, Century, Bouvier and other authorities) which generally describe the term as the consideration paid for "a contract of insurance." It is very natural to find in such general definitions a reference to contracts of insurance, but the showing made by plaintiff demonstrates that the overwhelming number of authorities, both technical and general, when speaking specifically of annuities, refer to the consideration paid therefor as a "premium."

To overcome this showing plaintiff relies on two main arguments:

First, it urges, that if the consideration for an annuity be called a "premium," it is not a premium for "life insurance." In plaintiff's analysis, the tax, so far as it is concerned, reaches only premiums paid on life insurance. The section does not so provide. It imposes the tax on every insurance company doing business in this state, and the tax is imposed upon "the gross premiums received upon its business done in this state . . ." — not upon gross premiums on its life insurance business done in this state. As already pointed out, the sale of annuities is part of the business done by insurance companies in this state. This argument is without merit.

The second argument advanced by plaintiff to meet the convincing showing made by defendant as to the proper meaning of the term "premiums," is that prior to 1910, and for twenty years thereafter, the constitutional provision was interpreted by the taxing authorities as not imposing a tax on the consideration received for annuities. The complete answer to this argument is that the record does not support plaintiff's contention. While it is true that the record definitely shows that the plaintiff did not include annuity premiums in its annual returns made to the insurance commissioner for the years 1930 to 1934, the record is very sketchy as to what plaintiff did prior to that time. Moreover, there is no evidence that the Insurance Commissioner knew that this plaintiff or any other insurance company was not reporting annuity considerations, or that he actively or passively acquiesced in such practice. Plaintiff relies strongly on the form provided by the Insurance Commissioner prior and subsequent to 1910 for the report of the gross premiums of insurance companies for purposes of the tax. This state form, in use in substantially the same form so far as this problem is concerned from 1906 to 1934, merely required "gross premiums" to be shown in one column, with no segregation between life insurance and annuity premiums, and another column was entitled "amount insured." The use of the phrase "amount insured," in plaintiff's view, is inconsistent with a request for the return of premiums received on annuity contracts. Professor Mowbray testified that it was feasible from an insurance standpoint to list the "amount of outstanding annuities," and explained in detail how that would, or could, be done. This destroys plaintiff's major premise that the heading "amount insured" necessarily meant that the insurance

commissioners had determined that annuity premiums should not be returned. Moreover, the evidence shows that the various foreign insurance companies also filed with the Insurance Commissioner so - called "convention" returns, setting forth their national annual business, in which form the number of outstanding annuity policies were listed together with the amount of annual payments represented thereby. In some of these annual statements one column was entitled "Gross Premiums less Reinsurance" received on annuities. In the annual statement of 1910 the consideration received for annuities in that year was included within the "Total of New Premiums" column. In line 17 of the form are listed "Renewal premiums for deferred annuities." It would be a reasonable assumption on the part of the Insurance Commissioner of California, in view of the care with which annuities were included in the convention form, that the same had been carried over into the California form without segregation. That is exactly what the commissioner did assume. The evidence shows that in 1910 the annuity business of life insurance companies was trivial in comparison with their life business. The annuity business remained a relatively minor part of the insurance business until about 1930 when the late depression caused a huge spurt in the annuity business. Certainly, the form of the return is not such as to compel the conclusion that the Insurance Commissioner knew that annuity considerations were not being included in the state returns.

In support of its contention that the Insurance Commissioner must have known that annuity considerations were not being returned, the plaintiff points to the state return made by the Metropolitan Life Insurance Company in 1911, the first year returns were made after the constitutional amendment went into effect. That company reported gross premiums for that year of $1,790,672.38, on a printed form. Underneath this figure, and outside the space on the form where gross premiums were required to be reported, in very small handwriting appears this notation: "$1,007.24 Consideration for Annuities not included in above." So far as the evidence is concerned, this is the only return filed from 1911 to 1934 by any insurance company that showed on its face that annuities were not included therein. From this isolated instance plaintiff argues that thereafter for over twenty years the commissioner acquiesced in the non-

inclusion of annuity considerations. To this argument there are several answers. The notation is written in such small writing that it is not unreasonable to infer that it was so inconspicuous that it escaped official notice. There is no evidence at all that the notation was observed and acquiesced in by the insurance department—in fact, at one time plaintiff professed a willingness to stipulate that if Mae Barr Long, whose duty it was then to examine such returns, were recalled as a witness, she would testify that she never observed the notation in question. It is hardly reasonable to argue that from this one isolated incident it can be inferred that every succeeding commissioner from 1910 on, knowingly acquiesced in the failure to report annuity considerations.

Except for the Metropolitan incident there is very little in the record to show what the contemporaneous construction of the department was for the period 1910 to 1927. Most of the records of the department for most of the period had been destroyed pursuant to statutory authority so that any formal rulings by the department on this question, if any, were not available. A fair reading of the testimony of the various ex-commissioners who were available at the time of trial, of Mae Barr Long, of William Tinkler, at present the principal examiner of the insurance department and a long time employee, and of H. F. Risbrough, who has been deputy commissioner since 1908, demonstrates that during this period the situation was as follows:

The insurance department did not examine foreign insurance companies carefully except when the company first qualified to do business in this state; because of lack of clerical and expert help, California was compelled to accept the careful periodical examination of the books of such companies made by the "home" state of the company; that these convention examinations of the nationwide business of such companies did not disclose the fact that these companies were not including the considerations received upon the sale of annuities for tax purposes, because, as already pointed out, the convention form definitely included receipts from the sale of annuities; that because of this fact, and, because during these years the annuity business was not a material portion of the business, the various insurance commissioners and their expert staff members simply "assumed" that annuity receipts were included. Certainly, there is no evidence that anyone was ever informed by the

department that annuity premiums were not to be included in the return. It was simply a situation where the department assumed the companies were including annuity receipts. Some companies apparently included annuity premiums while other companies apparently failed to do so. Certainly, such a factual situation cannot be distorted into a contemporaneous construction to the effect that such premiums properly could be excluded.

From the year 1927 on, there can be no doubt but that the department, in answer to several inquiries, uniformly ruled that annuity receipts must be included. On January 13, 1927, the then Insurance Commissioner, Charles R. Detrick, received a letter from the vice-president of the West Coast Insurance Company asking if the purchase money of a single payment life annuity came under the heading "gross premiums received" for taxation purposes. Under date of January 14, 1927, a letter was sent to that company signed "Charles R. Detrick, Insurance Commissioner, by Barrett N. Coates," a consulting actuary of the department, stating that "it is our understanding that the single premium received by your company as consideration for the issuance of a life annuity contract constitutes a gross premium . . . and that such premium should be included in the statement for tax purposes." There is nothing in the record to rebut the inference that that letter was merely a routine reply stating the well settled policy of the Insurance Commissioner's office toward that problem.

In 1932 the then commissioner E. Forrest Mitchell engaged in correspondence with the Pacific Mutual Life Insurance Company concerning this problem. During that year the attorney general of the State of Oregon had rendered an opinion that annuity considerations were not taxable in that state. This opinion provoked the request from the Pacific Mutual as to the law of this state. The problem was submitted to the late Frank L. Guerena, then attorney for Commissioner Mitchell. Mr. Guerena gave a written opinion to the commissioner in which he pointed out the differences between the Oregon and California statutory provisions, and in which he held that annuity receipts were taxable in this state. He also stated: "I am also advised that it has been the practice of insurance companies for many years to report their income from annuity contracts as taxable income. . . ." A copy of Mr. Guerena's opinion

was sent to Mr. Davis, vice-president and general counsel of the Pacific Mutual. Mr. Davis, under date of September 16, 1932, wrote to Commissioner Mitchell thanking him for a copy of the Guerena opinion, and stating: "I quite agree with the conclusion reached by Mr. Guerena, and now that that matter is settled, the main point is to determine that all companies operating in California are taxed upon the basis of the inclusion of annuity premiums in their statements." He also stated that he had been given to understand "that a number of Eastern companies were not paying taxes on these amounts." Under date of September 20, 1932, Mitchell wrote to Davis telling him he was glad that Davis agreed with Guerena on the question of the taxability of annuity premiums and continuing: "You may rest assured that every company operating in the State of California will be required to include annuity premiums in their statement. A special communication insisting on this point will be addressed to all concerned and the matter will be carefully watched by this Division." No such special communication was then sent out. From this fact, plaintiff argues that the commissioner acquiesced in the non-payment of such taxes. No such inference is permissible. A reading of the correspondence indicates that apparently some companies were paying the tax including, inferentially, Pacific Mutual, and some others were probably not paying it; that the commissioner determined to investigate, but, because of the tremendous work in connection with receiverships growing out of problems caused by the depression, did not get around to it until 1934 when the new forms for tax returns were prepared which provoked this litigation.

In 1933 the commissioner first became aware of the fact that a particular company had not paid the tax on its annuity considerations. In that year the Missouri State Life Insurance Company of Missouri was insolvent, and proceedings in connection therewith were pending in that state. In examining that company's books it was discovered that it had not included in its California tax returns annuity considerations sold in California. The Missouri court rejected this state's claim for such taxes, holding that there had been a long administrative interpretation in this state that such premiums were not taxable. Defendant states in his brief, and this fact is not challenged by plaintiff, that subsequent to the trial of the present case assets of the Missouri

company in California were by stipulated judgment applied to pay the challenged tax.

In May of 1934 the Union Labor Life Insurance Company inquired of the Insurance Commissioner if the annuity considerations were taxable in California. Mr. Mitchell replied that they were, and stated that if the company had not theretofore reported them it should inform him of the amount of such business. Under date of June 11, 1934, the company replied that such annuities had been included in its 1933 report.

The record need not be further analyzed. It is apparent from the above analysis of the evidence that:

1. The word "premium" for many years prior to 1910 was used technically and generally by insurance companies, insurance and legal writers and others to include the consideration received by the company on the sale of an annuity.

2. Contrary to the contentions of plaintiff there has not been an administrative interpretation over many years to the effect that such considerations need not be included. The most that can be said is that some companies did not include them, but that the Insurance Commissioner's office at all times assumed that such premiums were being included; that in view of the nature of the convention form this was a reasonable assumption; that whenever the problem was presented to the Insurance Commissioner he always replied that such considerations were taxable.

Without reference to the cases from other jurisdictions, it seems quite clear that under the constitutional and statutory provisions of this state, in view of the generally accepted meaning of the term "premium," and in view of what the record shows as to contemporaneous construction in this state, the holding of the trial court that annuity considerations are taxable as gross premiums was correct and should be affirmed. Some reference, however, should be made to the cases from other states.

An examination of such cases demonstrates that there is a hopeless conflict on the question presented on this appeal. There is a respectable number of cases holding that considerations paid for annuities are not premiums and are not taxable as such. Practically all cases so holding place their main reliance on a Pennsylvania case decided in 1916 and a New York case decided in 1920. The Pennsylvania case is *Com-*

*monwealth* v. *Metropolitan Life Ins. Co.,* 254 Pa. 510 [98 Atl. 1072]. The opinion in this case was written by the trial judge and was adopted by the Supreme Court of Pennsylvania without comment of its own. The first point discussed in the opinion was whether insurance companies could deduct dividends paid to policyholders by allowing them to be applied on premiums. After disposing of that point the trial judge considered whether the considerations received by the company upon the sale of annuities were premiums within the meaning of the Pennsylvania tax statute. The court first distinguished annuities from life insurance and then held: "The consideration for an annuity contract is not generally regarded as a premium. . . ." Not one authority is cited to support that conclusion.

The problem was next presented in 1920 to the New York intermediate appellate court in *People* v. *Knapp,* 193 App. Div. 413 [184 N. Y. Supp. 345]. Five judges sat in that case. The so-called majority opinion was prepared by Judge Henry Kellogg and was concurred in by but *one* other judge. In this opinion annuities are first distinguished from life insurance, and then, in reliance on the Pennsylvania case, *supra,* it is held that the considerations received on the sale of annuities are not premiums within the meaning of the tax statute there involved. The only other authorities cited are the general dictionary definitions of "premium" found in Webster, the Century dictionary and Bouvier, heretofore referred to in this opinion.

It will be noted that in the Pennsylvania case and in Judge Henry Kellogg's decision in the New York case the theory seems to be that since annuities are not life insurance, the consideration paid for annuities cannot be held to be premiums. That is a clear *non sequitur*.

In the New York case Judge Kiley filed a special concurring opinion. The opinion opens with this sentence (p. 348): "I cannot find that any other term has been used to designate the amount paid for an annuity contract than the word 'premium.' " He then agrees with Judge Henry Kellogg that there must be a reversal because the state failed to introduce any evidence on the question as to how the state had construed the provision in the past.

John M. Kellogg, P. J., wrote a dissenting opinion in which one other judge concurred, in which he held that the obvious intent of the taxing law was to tax the business of

insurance companies; that the sale of annuities was part of the business of insurance companies; that the word "premium" includes consideration paid for annuities.

Thus it will be noted that three of the five judges agreed that the term "premium" included considerations received on the sale of annuities. In 231 N. Y. 630 [132 N. E. 916], five judges of the court of appeals, with one judge absent, and Pound, J., dissenting, approved the following order: "Per Curiam: Order affirmed, with costs, on opinion of H. T. Kellogg, J., below."

Following these two decisions the following cases have held that annuity considerations are not premiums and are not taxable: (1937) *Daniel* v. *Life Ins. Co. of Virginia* (Tex. Civ. App.) 102 S. W. (2d) 256; (1938) *State* v. *Equitable Life Assur. Soc.*, 68 N. D. 641 [282 N. W. 411]; (1939) *State* v. *Ham*, 54 Wyo. 148 [88 P. (2d) 484].

In the North Dakota case, *supra*, there was a strong, well reasoned dissent. All of the cases place great reliance on the frail support of the Pennsylvania and New York cases, and in some of them great weight is placed on the fact that in the particular state there had been an administrative construction adverse to the inclusion of annuity considerations in the tax. In some of the cases the statutory provisions are dissimilar to those in this state, so that the opinions may be predicated on the language of the particular statute.

As opposed to these cases, the following cases have held that the considerations paid for annuities are premiums and are taxable: (1937) *Northwestern Mut. Life Ins. Co.* v. *Murphy*, 223 Iowa 333 [271 N. W. 899, 109 A. L. R. 1054], (an exceptionally well reasoned opinion discussing all prior cases and concurred in by all eight justices of the court); (1937) *New York Life Ins. Co.* v. *Sullivan*, 89 N. H. 21 [192 Atl. 297] (a unanimous opinion that considers and finds wanting most of the arguments advanced by plaintiff in the present case); (1939) *State* v. *New York Life Ins. Co.*, 198 Ark. 820 [131 S. W. (2d) 639] (a decision by a divided court. The evidence showed that the Insurance Commissioner, following the decisions in Pennsylvania and New York, *supra*, had ruled that such considerations were not taxable. The dissenting opinion is predicated partly on this administrative construction and partly on the peculiar legislative provisions in Arkansas); (1940) *State* v. *Mutual Life Ins. Co. of New York*, 189 Miss. 830 [196 So. 796, 198 So. 763] (where the majority

held that the meaning of the terms "gross amount of premium receipts" included annuity considerations and that there was no ambiguity in the statute); (1941) *State* v. *Lucas* (Mo.), 153 S. W. (2d) 10, 12 (a unanimous opinion where, after careful consideration, it was held that the contention that the money paid for an annuity was a "consideration" and not a "premium" "must be overruled, for textwriters, insurance departments, those familiar with the insurance business, insurance men, including relator's agents, and the public have been, for many years, referring to annuity contracts as policies, and referring to the money paid for an annuity as a premium"); (1941) *Equitable Life Assur. Soc.* v. *Hobbs,* 154 Kan. 1 [114 Pac. (2d) 871] (a decision by a divided court, the majority, after discussing all prior cases, holding that such considerations were taxable).

After reading all of the above cases we are convinced that the New York and Pennsylvania cases, and the cases following them, are unsound, and are predicated upon false premises and should not be followed. We are also convinced that the cases last above cited enunciate the proper rule and should be followed.

It follows, from an analysis of the California constitutional and statutory provisions, from an analysis of the proper meaning of the term "premium," and from the weight of authority outside the state, that considerations received upon the sale of annuities are "premiums" and are taxable as such, and that the position taken by plaintiff on its appeal is unsound.

### Appeal of Charles G. Johnson, State Treasurer of the State of California.

As already pointed out, the trial court held that plaintiff insurance company was entitled to a refund of taxes paid under protest in 1935 in the amount of $17,443.66. The defendant State Treasurer appeals from the judgment in favor of plaintiff for this amount.

Under article XIII, section 14(b) of the Constitution the tax is computed upon "gross premiums received upon its business done in this state, less return premiums. . . ." It was here stipulated that plaintiff received as gross premiums in 1934 (including annuity considerations) $11,474,830.61 on business done in this state. During the same year, according to the stipulation of facts, "plaintiff paid refunds and

cash values to holders of annuity contracts residing in the State of California in the sum of $670,909.94 . . ." on the types of annuity policies itemized in the stipulation. The tax, as assessed by the state, did not make a deduction for this item. The judgment for $17,443.66 is predicated on the deductibility of these "refunds and cash values" as "return premiums." The exact nature of these payments is not entirely clear from the record. Wendell Milliman, assistant actuary of the plaintiff, testified that these payments did not include "annuity payments made to annuitants under annuity contracts," but that such sums included "amounts returned to annuity purchasers on the surrender of annuity contracts." This witness conceded that cash and surrender values paid to holders of life insurance contracts were not deductible by his company; that the refund was claimed on annuity contracts because "upon surrendering the contract the annuitant foregoes the payment of any future amount provided for by that contract and covered by his original consideration. The amount returned to the annuitant at the time of the surrender of the contract is in that respect a return of the original consideration, or a portion of the original consideration."

Defendant contends that, even if such payments are "return premiums," as those terms are used in the Constitution, in this particular case they are not deductible because no tax was in fact paid on the premiums when received. It is argued that the theory of the deduction provision is that the company should not be required to pay a tax on premiums which are not retained by it but are returned to the purchaser of the annuity; that the "return premiums" here involved were paid to California residents in 1934, but were on policies issued prior to that year; that prior to 1934 the company interpreted the constitutional provision as not requiring the return of premiums paid for annuities; that, as a result, no tax was paid on the premiums when first received by the company, and, therefore, no refund should be allowed when a portion of such premiums is later returned to such purchaser. Plaintiff contends that the effect of the defendant's construction is to read into the constitutional provision following the words "return premiums" the words "previously taxed," without any warrant for such judicial interpolation. In support of his position, defendant cites a number of cases involving situations not allied to that herein, but which are cited

to show that the courts adopt a realistic approach to the construction of tax statutes, but admittedly none of the cited cases approaches the present one on the facts.

The argument of defendant, so far as this point is concerned, amounts to this: These refunds are "return premiums" as those terms are used in the constitutional provision, and, under normal circumstances, could be deducted, but, some time in the past, this company failed to pay the tax on the considerations secured upon the sale of annuities, and therefore, for these past sins, it should be precluded from securing a refund on return premiums in 1935 when it has not paid the tax on the original premiums some years before. This argument assumes that recovery for the past unpaid taxes is barred by the statute of limitations. We will assume, without deciding, that such recovery is barred. There is nothing in the constitutional provision intimating that return premiums are only deductible when the tax was paid on the original premium. When the tax statute was first passed in 1903, or when the constitutional provision was first passed in 1910, there can be no doubt that in those first few years most return premiums would be on policies issued prior to those dates. It would be a forced construction of the provision to say that such return premiums were not deductible because not previously taxed.

If the company were suing for a refund for the tax paid in 1935 on return premiums paid over in that year, and, if the state's action to recover for unpaid 1935 taxes on premiums was barred by the statute of limitations, we have no doubt at all that the unpaid taxes would be offset against the claim for a refund. That is as far as the cases cited by defendant go. But if defendant is correct, claims for taxes that we have assumed are barred by the statute of limitations may thus be recovered indirectly. That would violate the fundamental theory underlying statutes of limitations in tax statutes. Such a doctrine might well bankrupt a company where it had changed its position in reliance on the erroneous but good faith belief that no tax was due. If defendant's position is correct, whenever the government desired to collect a tax already barred by the statute of limitations, all it would have to do would be to levy an excessive tax for one year, and, when the taxpayer sued for a refund, claim that it had the right to offset taxes not paid many years before. We think the position taken by defendant on this point is untenable.

■ Defendant next contends that the amounts paid to holders of annuity contracts upon the surrender and cancellation of such contracts are not "return premiums" within the meaning of the Constitution. In this connection he also urges that even if such payments are "return premiums," such deductions are allowed only "upon business done in this state" and there is no evidence that payments were made on policies originally sold in California. He also contends that such payments were made on policies that to some extent contained life insurance features. These contentions present several difficult and debatable propositions.

The most obvious example of a return premium is presented by the situation when a fire insurance policy is cancelled. Normally, such policies are issued for three years, and the total premium for the three - year - period is paid when the policy is issued. If the policy is cancelled at the end of one year, the insured is entitled to a return of two years' premium. In connection with a life policy, the most obvious illustration is where the premium is paid, but, before the policy takes effect, it is cancelled because of fraud. The amount returned to the policyholder is clearly a return premium. Defendant contends that the phrase must be limited to such or similar situations and cannot be extended to include refunds and cash values paid to holders of annuity contracts upon the cancellation of their policies before the annuity takes effect. This contention is predicated on the argument that prior to the enactment of the constitutional tax provision, or the statute that preceded it, the phrase "return premiums" had acquired a well-defined meaning under which it was applicable to fire and other types of insurance, but not to life insurance or contracts of annuity. He further contends that in 1910, and for many years before that date, the law prohibited making cash payments upon the cancellation of life policies, and, in his analysis, upon the cancellation of annuity contracts.

We do not believe that the statutory provisions cited by defendant are conclusive on this question. Since 1872 the Civil Code has provided for the return of premiums in three code sections—sections 2617, 2618 and 2619 (now § § 481, 482 and 483, Ins. Code.) No useful purpose would be served by quoting those sections in this opinion. They are obviously applicable to insurance such as fire insurance, but less obviously applicable to life insurance or annuities. ■ How-

ever, section 2619 of the Civil Code, as originally enacted provided: "A person insured is entitled to a return of the premium when the contract is voidable, on account of the fraud or misrepresentation of the insurer, or on account of facts, of the existence of which the insured was ignorant without his fault; or when, by any default of the insured other than actual fraud, the insurer never incurred any liability under the policy." Clearly, that section could, and does, apply to life insurance and annuity policies. The other sections do not suggest what should be done on the cancellation of a life policy or an annuity policy.

So far as life insurance policies are concerned, from an early date there has been a specific provision which has regulated what shall be done on cancellation of such policies, which provision did not use the phrase "return of premiums." Section 451 of the Civil Code, enacted in 1873, provided for payment to the insured of a sum equal to 75 per cent of the then present value of the policy as ascertained by section 447 of the Civil Code. There can be no doubt that from this early date the Legislature treated return premiums as one thing, and cash paid on surrender or cancellation of life policies as quite another. That this surrender value did not apply to annuities is made quite clear by the subsequent statutory history. Long prior to 1910 the provision requiring the cash payment was repealed, and a new system of surrender values was adopted and set forth in section 450 of the Civil Code. By this section it was provided that on cancellation the entire net reserve value of the policy should be applied either to the purchase of non-participating term insurance for the full amount of the policy, or to the purchase of a non-participating paid up policy. This provision continued in force until 1911, and hence was in effect when the constitutional tax amendment was adopted. It is this provision which causes defendant to argue that when the tax amendment was adopted payment of cash was prohibited, with the result that at that time there could not have been a "return premium" on a life policy, and so, he urges, on an annuity policy. In 1911, section 450 was amended to direct payment of cash surrender values, but its application to annuities and certain other policies was expressly excluded.

It seems plain to us that section 450 of the Civil Code, either in its original or amended form, did not apply to

annuity contracts. Its inapplicability as amended is express, and, if applied to annuities in its original form, such application would result in an absurdity. As already pointed out, an annuity is different from a life policy. It would be absurd to say that the holder of an annuity, on cancellation, must accept term or paid up life insurance—something entirely different from an annuity, something he did not purchase and presumably did not desire.

From this analysis we think it quite clear that, except for the limited situations set forth in section 2619 of the Civil Code, *supra*, the Legislature, from an early date, so far as life policies are concerned, has distinguished between a "return premium" and the cash or surrender value paid upon the cancellation of such policies. Stated another way, except for the situations set forth in section 2619 of the Civil Code, the cash or surrender values paid upon the cancellation of life policies are not "return premiums" as those terms are used in the constitutional provision in question. They are not deductible from the amount of gross premiums received. The plaintiff's witness Milliman agreed that such payments on life policies were not deductible.

Some brief reference should be made to two California cases cited by the parties on this point. The first of these is *Northwestern M. L. Ins. Co.* v. *Roberts,* 177 Cal. 540 [171 Pac. 313]. The sole question involved in that case was whether "dividends" paid to holders of *life insurance policies* in a mutual benefit company were "return premiums" within the meaning of the tax provision here under discussion. The court held that they were not. The court found that the phrase "return premiums" as applied to life policies had a well-defined technical and limited meaning which was not broad enough to extend to such dividends. The court quoted, with approval, the definition of the phrase in Black's. Law Dictionary as follows (p. 543): " 'The repayment of the whole or a ratable part of the premium paid for a policy of insurance upon the cancellation of the contract before the time fixed for its expiration.' " On the same page the court stated: "In Joyce on Insurance and also in Elliott on Insurance—the two main modern text-books on this branch of the law—there are to be found in each an entire subdivision devoted to the subject of 'Return of premiums and assessments,' in which these terms are given application to cases wherein the risk has not attached, or where the policy is void, or has

been issued through a mistake of law or fact, or has been procured through fraud and the like, and wherein the use of the phrase is limited to the class of cases above enumerated. (Joyce on Insurance, c. 35; Elliott on Insurance, § 299; see, also, Dawson's Elements of Life Insurance, p. 166.) Nowhere, in fact, so far as the industry of counsel in the search for precedents has gone, or as our own independent research has extended, had the phrase 'return premium' ever been given in the domain of either fire or life insurance, prior to the enactment of the amendment to our Constitution under review, any other than the limited meaning in which that phrase has been defined and discussed by the law dictionaries and law-writers above referred to.''

The court went on to hold that, so far as life insurance was concerned, the phrase, as used in the Constitution, had this limited and technical meaning. The court did not consider the question whether a similar rule applied to annuities, nor did it consider the question whether ''premiums'' paid for an annuity were ''gross premiums.'' The court was not dealing with annuity contracts at all.

The other case referred to, and relied upon by plaintiff, is *Mutual Benefit L. Ins. Co.* v. *Richardson,* 192 Cal. 369 [219 Pac. 1003]. That case did not involve the interpretation of the phrase ''return premiums'' at all. It held that where dividends are applied to payment of the premium, the ''gross premium'' to be returned is the amount of the premium fixed by the policy as reduced by the dividend. It will be noted that by this decision the insurance companies accomplished the result they unsuccessfully attempted to secure in the Northwestern case, *supra,* but upon an entirely different theory. The decision did not purport to overrule the reasoning of the Northwestern case.

Under the decision in the Mutual Benefit case it is apparent that the insurance companies had been reporting gross premiums in excess of those required by law and were entitled to refunds. This led, in 1925, to the state and the insurance companies entering into a statutory stipulation providing, among other things, that ''matured endowments or surrender values'' on cancellation of life contracts should not be deducted as return premiums. (Stats. of 1925, p. 218.)

For these many reasons, we think it to be clear that cash or surrender values paid on the cancellation of a life insurance policy are not return premiums as used in the tax pro-

vision in question. But that does not determine that cash or surrender values paid on the cancellation of a pure annuity contract prior to the starting of payments to the annuitant are not return premiums. Section 2619 of the Civil Code, *supra*, obviously refers to annuity contracts, but that does not mean that the phrase "return premiums" is limited to the situations there set forth. Annuity contracts provide by their terms for refunds to the purchaser upon cancellation. If they did not so provide, few purchasers would be found for them. Payments so refunded before the risk attaches— i. e., before payments start to the annuitant—regardless of whether sections 2617 and 2618 of the Civil Code are applicable, are by contract "return premiums" within the meaning of the Constitution.

It seems quite clear that in the early statutory provisions in this state prior to 1910 the Legislature did not have specifically in mind cash or surrender values of annuity policies. That form of policy, in those early years, was such a minor part of the insurance business, that, so far as cash and surrender values are concerned, the Legislature did not find it necessary to protect the holders of such policies by specific statutory regulation. Section 594 of the Political Code, for reasons already set forth, did not make all provisions of the law relating to life insurance *ipso facto* applicable to annuities without regard to their obvious inappropriateness. So far as the cash and surrender values of annuities are concerned, the Legislature, apparently, was willing to let them be determined by the contract of the parties.

The conclusions so far advanced in this opinion, while in accord with plaintiff's main contentions on this appeal and in accord with the conclusions of the trial court, do not necessarily mean that the particular items involved on this appeal are deductible. An examination of the record discloses that there are several reasons why the evidence is insufficient to support the findings and conclusions of the trial court that these items are deductible.

It must be kept in mind that plaintiff is suing for a refund, and that, therefore, the burden of proof was on it to show that it was entitled to the refund. (*Miller* v. *McColgan,* 17 Cal. (2d) 432 [110 P. (2d) 419, 134 A. L. R. 1424] ; *Connecticut Gen. Life Ins. Co.* v. *Johnson,* 3 Cal. (2d) 83 [43 P. (2d) 278].) According to the stipulation of facts, these return premiums were paid on policies denominated as "Re-

tirement, Cash Refund, Life, Refund, Special Life, Income
Bond, and Group Annuity.'' As to several of these types of
policies, Professor Mowbray testified that they had connected
with the annuity feature, a life insurance feature in varying
degrees—that is, such policies had included therein some pro-
vision based upon a life contingency. What amount of the
return premiums paid to the holders of such policies was
predicated on original premiums charged for the life insur-
ance feature, and what portion was attributable to the annu-
ity feature, does not appear in the evidence. Cash surrender
values on life policies are not deductible. Moreover, it is only
those cash surrender values paid on annuity policies cancelled
before the risk attaches—that is, before payments have started
to the annuitant—that are deductible as return premiums.
The evidence fails to disclose the matters from which a proper
computation can be made. For that reason, this portion of
the judgment must be reversed. Justice requires that this
issue be retried where the parties can introduce evidence on
these factors.

There is one other matter that should be mentioned. Ac-
cording to the stipulation, the so-called return premiums
were paid to ''holders of annuity contracts residing in the
State of California.'' There is no indication in the stipula-
tion, or in the evidence, that such return premiums were paid
on policies originally written in California. The defendant
views as shocking the contention of the plaintiff that return
premiums paid to residents of this state without regard to
where the original premiums were collected or the annuity
contracts entered into are deductible as return premiums.
The constitutional provision imposes the tax on the ''amount
of the gross premiums received upon its business done in this
state, less return premiums. . . .'' The defendant contends
that the deduction or credit allowed for ''return premiums''
is, in legal effect, an exemption from liability, and, as such,
must be strictly construed against the taxpayer (*Miller* v.
*McColgan, supra,* p. 442) ; that, reasonably interpreted, the
constitutional provision means that return premiums can
be deducted only when the original policy was issued in this
state. The plaintiff contends that any return premium paid
to a resident of California is deductible whether or not the
original premium was collected in California. Thus, plain-
tiff contends that, if an annuity policy was issued in a for-
eign state, and, thereafter, the policyholder becomes a resi-

dent of California and while residing here cancels the annuity contract under such circumstances that the surrender value is a return premium, the payment is deductible although the original policy was not sold in this state. The constitutional provision is not clear on this point. It would appear that the phrase ''business done in this state'' qualifies both ''gross premiums'' and ''return premiums.'' It is a possible construction to say that it was the purpose of the provision to allow a deduction for the return of the premium only where the original premium was collected in California, that is, was part of the ''business done in this state'' by the insurance company; that, otherwise, the ''return premium'' is not on ''business done in this state'' as that phrase is used in the provision in question.

On the other hand, the construction contended for by plaintiff is also possible. The solution of this problem affects not only companies selling annuity policies, but every company selling any type of policy in this state. The problem was only incidentally presented to the trial court and is only cursorily treated in the briefs. It seems more than likely that evidence is available as to how the taxing authorities and the insurance companies have interpreted this problem during the almost forty-year-period that this provision, or its counterpart, has been in effect. Plaintiff contends that it would be impossible, from an accounting standpoint, to apply the section as interpreted by defendant. That contention, if true, would certainly be a factor in interpreting the section. Obviously, it will not be presumed that the provision would grant a reduction and then deny it because it cannot be computed. But that is a matter that can only be proved by expert testimony. For these reasons, inasmuch as this phase of the case must be retried for other reasons, the court expresses no opinion on the point under consideration. That point can be more fairly determined after a trial at which both litigants may offer what evidence is available on the issue.

### Summary and Conclusion.

As heretofore pointed out, this action was brought by plaintiff for the refund of taxes paid by it under protest in the amount of $330,348.22, reduced at the trial to $298,345.60. The theory of plaintiff was that the considerations paid for annuities were not ''gross premiums'' within the meaning of article XIII, section 14(b) of the Constitution. The trial court

held adversely to this contention of plaintiff. The trial court did hold, however, that plaintiff was entitled to a refund of $17,443.66, and entered judgment in plaintiff's favor in this amount. This judgment was predicated on the theory that plaintiff was entitled to deduct from its gross premiums received in 1934 the amount of $670,909.94—the amount of refunds and cash values paid by plaintiff in that year to holders of annuity contracts residing in this state. From this judgment both plaintiff and defendant have appealed, the former contending that it is entitled to a refund of the total amount claimed, and the latter claiming that plaintiff is entitled to no refund at all.

In this opinion we have held that the trial court was correct in its holding that the considerations paid for annuity contracts constitute "gross premiums" as those terms are used in the taxing provision in question. That issue has been determined and should not be retried.

On the appeal by the defendant we have held that the evidence does not sustain the findings that the sum fixed in the judgment is deductible. Plaintiff is entitled to some deduction if it can present the evidence required under the rules laid down in this opinion. Justice requires that it be given the opportunity, if it so desires, to present that evidence. If the plaintiff be so inclined, a retrial should be had solely to determine the amount of return premiums which plaintiff may be entitled to receive under the rules set forth in this opinion.

For the foregoing reasons, on the appeal of defendant, the judgment is reversed for the limited purposes heretofore indicated, and the trial court directed to proceed as herein set forth, the defendant to recover costs on both appeals.

Ward, J., and Conlan, J. pro tem., concurred.

A petition for a rehearing was denied July 29, 1942, and plaintiff and appellant's petition for a hearing by the Supreme Court was denied August 27, 1942. Spence, J., and Edmonds, J., did not participate therein. Spence, J., acted pro tem.