[Nos. B064437, B064620, B064871. Second Dist., Div. Four. Nov. 30, 1992.]

TEXAS COMMERCE BANK et al., Plaintiffs and Respondents, v. JOHN GARAMENDI, as Insurance Commissioner, etc., et al., Defendants and Appellants; NATIONAL ORGANIZATION OF LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATIONS et al., Interveners and Appellants.

## COUNSEL

Daniel E. Lungren, Attorney General, Edmond B. Mamer, Deputy Attorney General, Rubinstein & Perry, Karl L. Rubinstein and Dana Carli Brooks for Defendants and Appellants.

Parker, Milliken, Clark, O'Hara & Samuelian, Nowland C. Hong, Claire D. Johnson, Michael S. Simon, Hopkins & Sutter, William Carlisle Herbert, Pachulski, Stang, Ziehl & Young, Larry W. Gabriel, Brobeck, Phleger & Harrison, David M. Higgins, Robert L. Hagle and Kent M. Roger for Interveners and Appellants.

Seyfarth, Shaw, Fairweather & Geraldson, Jeffrey Anne Tatum, Debevoise & Plimpton, Daniel G. Murphy and Andrea Oser as Amici Curiae on behalf of Interveners and Appellants.

Pillsbury, Madison & Sutro, Philip S. Warden, John M. Grenfell, Catherine D. Meyer, Kevin M. Fong, Mark Schallert, Robert L. Wallan, Fried, Frank, Harris, Shriver & Jacobson, Jed S. Rakoff, Howard W. Goldstein, Stephen D. Alexander, Manatt, Phelps, Phillips & Kantor, Philip R. Recht, Weinberg & Green, Charles O. Monk II, Arthur F. Fergenson, Sherry H. Flax, Matthew G. Dobson, Adams, Duque & Hazeltine, Catherine Hunt Ruddy,

Terry L. Tron, Thelen, Marrin, Johnson & Bridges, Gary Fontana, Christine C. Franklin, Russell L. Allyn, John R. Foot and Allison A. Cheek for Plaintiffs and Respondents.

Dan Morales, Attorney General (Texas), Marc H. Burns, Assistant Attorney General, Kindel & Anderson, Dale S. Fisher, Allan Grossman, Lillick & Charles, Stephen Oroza, John M. Rosenthal, Lawrence N. Minch, Kristine E. Bailey, Bracewell & Patterson, Leonard J. Rubin, Megan P. O'Neill, John J. Gill and Michael F. Crotty as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**WOODS (A. M.), P. J.**—These consolidated appeals arise from judgment entered in seven underlying consolidated actions for declaratory relief.

The judgment determines that purchasers of "Municipal Bond Guaranteed Investment Contracts" (Muni-GICs) from Executive Life Insurance Company (ELIC) in 1986 have preferred class-5 claim priority as insurance "policyholders," rather than class-6 "all other claims priority" in ELIC's pending insolvency proceedings.

The primary issues raised are as follows: (1) whether Muni-GICs were insurance annuities under Insurance Code section 101[1] when they were issued in 1986; (2) whether enactment in 1988 of section 10541 retrospectively alters the status and claim priority of the 1986 Muni-GICs in the ELIC liquidation proceedings; (3) whether the liquidation claim priority of the subject Muni-GICs is determined as of their status when issued in 1986 or, rather, as of April 11, 1991, when the order for conservation was entered; (4) whether the Muni-GICs sold in states other than California are exempt from any retroactive effect of section 10541 because their status as insurance annuities is controlled by the laws of the states where sold; (5) whether Muni-GICs are materially distinguishable from "Pension Fund Guaranteed Investment Contracts" Pension-GICs), which the Insurance Commissioner has given "policyholder" liquidation status; (6) whether, assuming the 1986 Muni-GICs were not insurance annuities when issued or are not such for purposes of the ELIC liquidation claim priorities, the Muni-GIC claims are entitled to class-5 priority as claims for "return of unearned premium."

As we will discuss in detail, we conclude that the 1986 Muni-GICs are insurance annuities-certain entitled to liquidation priority as "policyholder claims." This conclusion is compelled by the language of section 101, read in light of the historical acceptance of annuities-certain as a traditional form of insurance business, and the conformity of the Muni-GICs to other essential characteristics of insurance.

---

[1]All future references are to the Insurance Code unless otherwise indicated.

## FACTS

The dispute as to liquidation claim priority arises from events commencing in 1986 when ELIC began marketing the subject Muni-GICs in California, Texas, Louisiana, Tennessee, Colorado, and Minnesota.

ELIC marketed the Muni-GICs as an insurance product. ELIC believed that under California law it was not required to file a specimen Muni-GIC for approval, but it did file a specimen Muni-GIC form (form 642) and assumed approval was automatic.

In 1986, for a total consideration of approximately $1.8 billion, ELIC sold eight Muni-GICs to banks in California and the states mentioned above. The banks purchased the Muni-GICs as indenture trustees for the local municipal entities that had issued low-income housing bonds and transmitted the proceeds to the banks for purchase of Muni-GICs.

The Muni-GICs are structured to accumulate at a guaranteed rate and to pay accumulated interest on semiannual payment dates. Two of the Muni-GICs provide for payment of the entire accumulated interest amount semiannually; the owner (trustee) may request a lesser payment by prior notice. The other Muni-GICs require the owner to give prior specification of the amount of the payment (up to the total accumulated interest) before each semiannual payment date.

The GICs also permit the trustees to periodically withdraw specified additional maximum amounts during the contract period. The contracts contain a renewal option. If renewed, the guaranteed contract interest rate must be renegotiated.

The Muni-GICs are comprised of a "funding contract" and an integrated "investment agreement" whereby the insurer and the purchaser agreed to enter into the funding contract. These contracts are separate and independent from, but transactionally related to, corresponding "indenture agreements."

The "Indenture Agreement" is a contract between a municipal bond issuer and its indenture trustee, a bank. Under the indenture, the bank trustee is obligated to purchase an ELIC Muni-GIC with the proceeds of a municipal bond issuance. Thereafter, indenture trustees are obligated to transmit periodic interest payments, and optional withdrawals, received from the Muni-GIC to the bond issuer and to the bondholders to meet the issuer's obligations on the bonds and to fund construction mortgages pursuant to the bond issuance.

The "Funding Contract" is a contract between an indenture trustee and ELIC whereunder ELIC is obligated, as mentioned above, to make semiannual payments of accrued interest at a guaranteed rate during a certain period. In addition to the periodic interest payments, limited withdrawals on principal and unpaid accumulated interest are permitted. Certain of the Muni-GICs permit such withdrawals only during certain years; others permit more limited withdrawals every year. Withdrawals incur surrender charges. Any balance in the Muni-GIC at the end of the contract is to be paid to the trustee.

In late 1986 ELIC was advised by the California Department of Insurance (the Department) that the Department did not consider the Muni-GICs to be insurance annuities, as defined in section 101, because they are not specifically authorized under the Insurance Code. The Department forwarded an opinion letter to ELIC concluding the GICs are not insurance annuities because they do not have a relation to a human life, do not indemnify the holder or shift risk, and do not provide for accumulation of funds with an option to purchase an annuity in the future (in the manner of a Pension-GIC, which the Department accepted as an insurance annuity).

ELIC ceased marketing Muni-GICs.

In its 1987 biennial examination of ELIC, the Department approved ELIC's reserve accounting for the Muni-GICs as insurance product (line 10.2) rather than as debt (line 21). This method of reserving under the Standard Valuation Law (§ 10489.6) requires greater reserves for insurance product liabilities than for ordinary debt.

In 1987, the California Life Insurance Company and the Association of California Insurance Companies sponsored Senate Bill No. 901 that was enacted in 1988 as section 10541. (Sen. Bill No. 901 (1987-88 Reg. Sess.) § 1.) It became effective January 1, 1989.

Section 10541 was intended to and did expressly authorize life insurance companies to issue "funding agreements." Muni-GICs came within the statute's definition of "funding agreement." The statute specifies that funding agreements are not insurance business but are nevertheless deemed to be lawful business for life insurers. Section 10541 expressly provides that "funding agreements" are exempt from the California gross premium tax applicable to insurance products.

In 1990, ELIC began experiencing severe financial difficulties. On April 11, 1991, an order commencing conservation proceedings was filed pursuant to section 1011.

In the proceedings, the commissioner, as conservator, assigned the 1986 ELIC Muni-GICs owners (the trustees) "class-6" priority status (all other claims) rather than "class-5" priority status as "policyholders."

The trustees thereupon filed the consolidated underlying declaratory relief actions seeking to reverse the commissioner's designation of claim priority.

After trial the superior court issued its statement of decision. The court determined the critical issues of law in favor of plaintiffs: "The GICs fit both the financial and insurance definition [*sic*] of an annuity, and it is not necessary to stretch either definition to include the Muni-GICs. . . . Thus, prior to the enactment of § 10541, the GICs were included as policies within § 1033, subd. (a)(5) by the application of § 101, just as any other annuity." Section 10541 does not retroactively alter the insurance status of the 1986 Muni-GICs, nor is that statute a codification of prior law fixing such status. Retroactive application of the statute would be unlawful.[2]

The court made the fact-findings that ELIC had made the Department aware that the Muni-GICs were being marketed as insurance product and that the Department did nothing to cancel the issued Muni-GICs or permit purchasers to rescind the contracts. Neither did the Department take steps to preclude other insurers from issuing Muni-GICs. The Department did send negative letters to two insurers who inquired as to authorization. The Department required ELIC to reserve for the Muni-GICs as insurance product and to pool admitted assets for those reserves with the admitted assets for policy reserves.

The statement of decision also determined that if the 1986 Muni-GIC were not authorized insurance, the holders would still be entitled to "priority 5" status as "claims for refund of unearned premiums" on an unauthorized (void) product.

---

[2]Appellants contend that the challenged ruling on issues of law is improperly based on a result-oriented "weighing of equities" test. Respondents characterize the ruling's reference to equity and fairness as limited to the proper scope of testing a statutory construction for reasonableness and as secondary to stated, valid legal grounds. In this regard real parties urged that the Muni-GICs were purchased by banks solely as commercial investments subject to investment loss, while life insurance policies and true insurance annuities were purchased to provide traditional insurance protection to people. Thus, allowing banks holding Muni-GICs to share priority claim status with true insurance policyholders would effect an undeserved windfall to mere commercial investors.

On the other hand, petitioners pointed out that they purchased the Muni-GICs as insurance annuities and paid $1.8 billion in premiums, which now constitute a significant portion of the ELIC assets. They reason it would be unjust to deny them any share of the ELIC assets while using their $1.8 billion in premiums to pay other policyholders. We need not address this dispute because we determine the challenged ruling is valid under accepted principles of statutory construction.

DISCUSSION

As will be explained in parts II and III of this opinion, the status of the subject Muni-GICs as insurance annuities is determined as of the date of their issuance. Our discussion will, unless otherwise indicated, concern the law as of the time the 1986 Muni-GICs were issued.

I

THE 1986 MUNI-GICs ARE INSURANCE ANNUITIES UNDER CALIFORNIA LAW

The critical question is whether purchasers of the 1986 Muni-GICs qualify under the liquidation claim priority statute (§ 1033) as "policyholders" (subd. (a)(5)) or are, instead, relegated to subdivision (a)(6) priority as "all other claims."

This question ultimately turns upon whether the Muni-GIC contracts are "annuities" within the meaning of section 101. Specifically, does section 101 require that annuities "appertain to the lives of persons" in a manner similar to life insurance?

No provision of the code or any other California statute or reported case explicitly defines what constitutes an annuity under section 101.

Two secondary issues are (1) whether the Muni-GICs meet other criteria for annuities-certain, and (2) whether section 101 annuities must, if not required to have a connection to human life, have certain risk-transfer characteristics similar to insurance.

A. *Section 101 Annuities Need Not "Appertain to Lives of Persons"*

The critical question of law is whether the term "annuities" in section 101 was intended to include only annuities "upon the lives of persons or appertaining thereto" or, rather, was intended to include annuities-certain, which require periodic payments for a specified term and are not contingent upon human life.

As we will explain in detail, the structure of section 101 and its statutory predecessors, as well as the historical recognition of annuities-certain in insurance treatises and actuarial texts contemporaneous to enactment of the statute, require the conclusion that the Legislature did not intend to impose such a limitation.

Section 380 defines a "policy" as a contract of insurance. Section 22 defines "insurance" as "a contract whereby one undertakes to indemnify

another against loss, damage, or liability arising from a contingent or unknown event."

Life insurance is one of 21 classes of insurance presently authorized in California by section 100, subdivision (1).

Section 101, entitled "Life Insurance," which is the critical statute, provides: "Life insurance includes insurance upon the lives of persons or appertaining thereto, and the granting, purchasing, or disposing of annuities."

The parties urge contrary constructions of section 101.

Appellants contend that section 101 must be read as applying the limiting phrase "upon the lives of persons or appertaining thereto" to annuities. Respondents contend that the structure of section 101 manifests the intention not to apply the limiting phrase to "annuities."

1. *Statutory Construction*

(a) *Primary Rule: Legislative Purpose*

■ We begin with the primary rule of statutory construction that courts must attempt to ascertain the legislative purpose by reading the statute as a whole and in connection with related statutes. (*People* v. *Fierro* (1991) 1 Cal.4th 173, 225 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *Larcher* v. *Wanless* (1976) 18 Cal.3d 646, 658 [135 Cal.Rptr. 75, 557 P.2d 507].) However, this process does not provide the answer.

Reading section 101 in light of section 100 reveals that section 101 is intended to delineate a particular class of authorized insurance business.

■ Reading section 101 together with section 22 reveals that section 101 is intended to authorize annuities as "life insurance" business despite the fact annuities fail to meet the statutory definition of insurance.

Section 22 defines insurance as "[a] contract whereby one undertakes to *indemnify* another against loss, damage, or liability arising from a contingent or unknown event." (Italics added.) It is recognized by early case law and by authorities today that annuities do not come within the definition of "insurance" because they do not have the requisite element of indemnification. (*Equitable Life etc. Soc.* v. *Johnson* (1942) 53 Cal.App.2d 49, 57 [127 P.2d 95]; *Estate of Barr* (1951) 104 Cal.App.2d 506, 508 [231 P.2d 876]. See also

1 Appleman, Insurance Law and Practice (1981 rev. ed.) § 84, p. 295; 2 Cal. Insurance Law and Practice (1992) § 20.21[2][c], P. 20-37.)

Thus, section 101 appears to be intended to authorize the "granting, purchasing and disposing of annuities" as life insurance business even though annuities clearly would not otherwise qualify as insurance. Section 101 itself is structured in a dichotomous manner also indicating that "annuities" are different from, but authorized as, life insurance.

The unanswered question is whether the Legislature intended to restrict section 101 annuities to those having other characteristics of life insurance, such as life contingency.

### (b) *Secondary Rules of Construction*

#### (i) *Intrinsic Aids*

Appellants urge invocation of the principle of statutory construction, *noscitur a sociis*,[3] to restrict the meaning of "annuities" in section 101 to annuities "upon the lives of persons or appertaining thereto," i.e., life annuities.[4]

However, respondents point out that section 101 is dichotomous in structure and sets off the clause containing the qualified term "insurance" from the clause containing the unqualified term "annuities." In section 101 only

---

[3]*Noscitur a sociis* ("it is known by its associates") is the principle that " ' "the meaning of a word may be enlarged or restrained by reference to the object of the whole clause in which it is used." ' " (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391, fn. 14 [241 Cal.Rptr. 67, 743 P.2d 1323]; *People v. Stout* (1971) 18 Cal.App.3d 172, 177 [95 Cal.Rptr. 593].)

The related principle of *ejusdem generis* suggests that where a statute enumerates specific classes of persons or things followed by general words, the general words are to be construed to refer only to other items or classes that are similar to (have a characteristic common to) those which are specifically enumerated. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142 [278 Cal.Rptr. 614, 805 P.2d 873].)

[4]At trial the commissioner formally conceded that he had assigned priority 5 claim priority to other types of annuities that did not have any life contingency. But he maintained that these other annuities exhibited other characteristics rendering them insurance product, in contrast to the 1986 Muni-GICs.

In additional briefing requested by this court, the commissioner concedes that treatises contemporaneous to the enactment of section 101 and its predecessor, former Political Code section 594 (Stats. 1907, ch. 119, p. 141) demonstrate that annuities-certain were generally accepted life insurance business when those statutes were enacted. The commissioner concedes that section 101 annuities need not have a mortality risk (be contingent upon a human life), but maintains that annuitants must be natural persons. The other appellants have not acknowledged these texts or made a similar concession. They maintain that section 101 annuities must be contingent upon human life (e.g., life annuities).

the term "insurance" is antecedent to the qualifying phrase "upon human lives or appertaining thereto." That qualifying phrase is antecedent to, and is set off by comma from, the clause dealing with "annuities." ▇ An accepted rule of statutory construction is that qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. (2A Sutherland, Statutory Construction (5th ed. 1992) § 47.33, p. 270.) Nothing in the structure or syntax of section 101 suggests a legislative intent contrary to this rule.

Respondents conclude that section 101 must be read as intended to include two distinct items within the rubric "life insurance" but to subject only "insurance" to the requirement that it appertain to the lives of persons.

Respondents' suggested construction conforms to the rules of syntax and the derivative principle of statutory construction that relative or modifying phrases or words are presumed to modify only antecedent, enumerated terms and not more remote terms. (2A Sutherland, Statutory Construction (5th ed. 1984) § 47.32, pp. 270-273; 58 Cal.Jur.3d (1980) Statutes, § 128; *People* v. *Baker* (1968) 69 Cal.2d 44, 46 [69 Cal.Rptr. 595, 442 P.2d 675]; accord, *Oliva* v. *Swoap* (1976) 59 Cal.App.3d 130, 138 [130 Cal.Rptr. 411].) This rule was recognized when section 101 was enacted in 1935. (*Hopkins* v. *Anderson* (1933) 218 Cal. 62, 65 [21 P.2d 560].)

Given the structure of section 101, we do not believe that *noscitur a sociis* or the related principle of *ejusdem generis* is controlling. ▇ The principles are mere aids, not to be followed when a statute is not amenable to their application. (*Russell Co.* v. *United States* (1923) 261 U.S. 514 [67 L.Ed. 778, 43 S.Ct. 428]; *Larcher* v. *Wanless, supra,* 18 Cal.3d at 658.)

One commentator has framed the test for application of *ejusdem generis* as follows: "The doctrine of ejusdem generis applies when the following conditions exist: (1) the statute contains an enumeration by specific words; (2) the members of the enumeration suggest a class; (3) the class is not exhausted by the enumeration; (4) a general reference supplementing the enumeration, usually following it; and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires. . . . [¶] A 'class' is a conceptual creation encompassing numerous items with similar characteristics. . . . The purpose for defining the class by *illustrative particularizations accompanied by a general catchall reference* is to determine how extensively the act was intended or should reasonably be understood to apply." (2A Sutherland, Statutory Construction, *supra,* § 47.18, p. 200, italics added; see also *id.,* § 47.20, p. 205.)

Applying this delineation of *ejusdem generis* to section 101, we conclude that conditions (1), (2), (4) and (5) are not met.

Section 101 simply does not contain an enumeration of "numerous" "illustrative particularizations" suggesting a class. The clause describing annuities is set apart from the preceding clause concerning life insurance. There is no indication that the modifying phrase in one clause is intended to have limiting application in the other.

Neither does section 101 contain the "specific/general" syntactical structure amenable to *ejusdem generis*. The phrase "upon the lives of persons or appertaining thereto" is a limiting, not a general term. Thus, *ejusdem generis* would require "annuities" to be the general term limited by the clause "insurance upon the lives of persons or appertaining thereto," which is located in a different clause. But the term "annuities" may not reasonably be characterized as a "general, catch-all reference" designed to include other types of life insurance within the statutory class. (2A Sutherland, Statutory Construction, *supra*, § 47.18, at p. 201.)

Cases typically apply *ejusdem generis* to phrases that enumerate several specific items followed by a general reference to "other . . ." or "other materials . . . ." (See 2A Sutherland, Statutory Construction, *supra*, § 47.17, pp. 188-189; *People* v. *Thomas* (1945) 25 Cal.2d 880, 899 [156 P.2d 7].)

Neither would the principal function of *ejusdem generis* be served in section 101. ▮▮▮ The function of the doctrine is to limit the scope of an antecedent general reference to items having a particular characteristic shared by the preceding enumerated specific terms and, thus, to avoid an incompatibility between specific and general words that would render one or the other superfluous. (See 2A Sutherland, Statutory Construction, *supra*, §§ 47.17, 47.18, pp. 188-189, 200-203.)

In section 101 the term "insurance upon or appertaining to the lives of persons" would certainly not be rendered superfluous in section 101 if it did not function to limit the term "annuities."

Neither does the related doctrine of *noscitur a sociis* have application here.

▮▮▮ *Noscitur a sociis* is applicable to terms that are "associated" by grouping or serial enumeration in the same phrase or clause, not to terms that are set apart in different clauses for apparent disparate treatment. (See *Harris* v. *Capital Growth Investors XIV*, *supra*, 52 Cal.3d at p. 1152; *People* v. *Rogers* (1971) 5 Cal.3d 129, 142 [95 Cal.Rptr. 601, 486 P.2d 129]; *Brooks* v. *County of Santa Clara* (1987) 191 Cal.App.3d 750, 759 [236 Cal.Rptr. 509].) Section 101 cannot reasonably be read to group the terms "insurance" and

"annuities" together because the statute sets the two terms apart in separate clauses with different qualifying phrases.

However, under broader reasoning analogous to *noscitur a sociis* it may be argued that the very inclusion of the term "annuities" within the section 101 "life insurance" classification implies a legislative intent to include only annuities with a connection to lives.

This proposition has certain logic and casts some doubt upon a construction of section 101 based solely upon syntax and internal structure. However, as we will demonstrate (*post*, pt. I.A.1(b).iii), our construction of section 101 is corroborated by the fact that annuities-certain, having no connection to human lives, were well accepted as a traditional form of *insurance* annuity when section 101 and its predecessor statute were enacted. This fact, together with the structure of section 101, requires the conclusion that the Legislature did not intend to restrict section 101 to life annuities. Had the Legislature intended to impose such a restriction upon a term with a well-established comprehensive legal and commercial meaning, we must presume it would have done so explicitly rather than by implication.

### (ii) *Legislative History*

Neither the legislative history of section 101 nor earlier California statutes or case law demonstrates whether annuities-certain were historically accepted as insurance business prior to 1935.[5]

---

[5]Former Political Code section 594 was the predecessor of section 101. As enacted in 1907 (Stats. 1907, ch. 119, pp. 141-142) it provided: "All insurance business in the state of California is hereby classified in the thirteen kinds as follows: First, life insurance business, including endowments and annuities, but not including health or accident or sickness insurance or any casualty insurance as hereinafter provided." The 1913 amendment to section 594 (Stats. 1913, ch. 269, § 1, p. 483), altered the statute to read: "All insurance business in the State of California is hereby classified in the following sixteen kinds, namely: [¶] 1. Life insurance, including within its meaning insurance upon the lives of persons and every insurance appertaining thereto, and the granting, purchasing and disposing of annuities."

The 1913 amendment refers to life insurance and explicitly defines its scope as pertaining to the lives of persons. The term "endowments" did not appear in the statute. Annuities remain, and the type of annuity transactions permitted as insurance business are specified. The amendment does not add a specification that annuities must appertain to the lives of persons in a manner similar to life insurance.

The early case, *Briggs* v. *McCullough* (1869) 36 Cal. 542, 549-559, holds that an endowment contract providing for payment of a sum certain to the purchaser 10 years hence or payment of that sum to his designee should the purchaser die within the 10-year term, meets the criteria for life insurance. *Briggs* reasons that the endowment contract is analogous to term life insurance because the endowment provides for payment of a stipulated sum of money to a designee in the event of the purchaser's death during a particular term. The additional aspect that the stipulated payment would be made to the purchaser if he survives the specified term

### (iii) *Contemporaneous Meaning of "Annuities"*

Corroboration of our construction of section 101 is found in insurance-law treatises and other legal and actuarial texts contemporaneous to the enactment of section 101 and its predecessor. These texts demonstrate that the "annuity-certain" was a traditionally accepted insurance product that was not contingent upon human life.

■ It is an accepted principle of statutory construction that words employed in a statute dealing with legal or commercial matters are presumed to be used in their established legal or technical meanings unless otherwise clearly indicated by the statute. (*In re Smith* (1928) 88 Cal.App. 464, 467-468 [263 P. 555]; *Bullock v. City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1096 [271 Cal.Rptr. 44]; *Plotitsa v. Superior Court* (1983) 140 Cal.App.3d 755, 762 [189 Cal.Rptr. 769]; 2B Sutherland, Statutory Construction (5th ed. 1992) § 50.03, pp. 103-106; 58 Cal.Jur.3d, *supra*, Statutes, § 126, pp. 519-520.) As we will demonstrate, both the commercial and legal definitions of "annuity" included annuities-certain when section 101 was enacted.

---

was viewed as not divesting the endowment of its life-insurance character. (36 Cal. at pp. 550-551.)

No reported case between 1869 and 1907 has been found which alters the *Briggs* classification of endowments. No reason is apparent for the 1913 deletion of endowments from former section 594 "life insurance business."

No prior and contemporaneous California statute or case specifies the meaning of "annuity" in the context of insurance.

Prior to enactment of former Political Code section 594 in 1907, the term "annuity" appeared in California statutes in two areas of law.

One statutory definition of "annuity" was a testamentary bequest. (Civ. Code, former § 1357, subd. (3), enacted in 1872.) This usage has significance in this analysis in the general sense that annuities were not understood as necessarily involving payments that terminate upon the death of the annuitant ("life annuities").

The second early statutory reference to annuities relates to mutual insurance associations. The language is strikingly similar to section 101 and its predecessor, former Political Code section 594.

The first statutory authorization for mutual life insurance associations (as opposed to stock insurance companies) in California appears to have been enacted in the 1865-1866 Legislative Session. Pursuant to Statutes of 1865-1866 (ch. 546, §§ 1, 3, pp. 752-753), 13 or more persons were permitted to incorporate ". . . a mutual insurance company for the purpose of making *insurance on the lives* or health *of individuals* or against accidents to them, *and every insurance appertaining thereto or connected therewith, and to grant, purchase, and dispose of annuities*. Insurance on lives, . . . may in each case respectively include insurance for the whole term of life or any shorter period." (Italics added.) (See also Stats. 1891, p. 126, The Act of March 19, 1891, which provided for mutual insurance associations "relating to life, health, accident, and annuity or endowment insurance on the assessment plan and the conduct of the business of such insurance.")

Civil Code former section 437 (Stats. 1905, ch. 188, pp. 183-184), differentiated between life insurance and annuities in the context of mutual insurance companies. Such companies could make insurance on the lives of persons and "purchase and sell annuities."

The basic common law definition of "annuity" was pronounced by Sir Edward Coke (Lord Chief Justice of the King's Bench, 1613-1620) as "a yearly payment of a certain sum of money granted to another in fee for life, or years, charging the person of the grantor only." (Kopf, The Early History of the Annuity (1926-1927) Proceedings of the Casualty Actuarial Society, p. 225.) With minor variations, not pertinent to this discussion, this inclusive definition has continued in English and United States common law and was adopted in the actuarial and insurance texts prior to enactment of section 101 in 1935 and former Political Code section 594 in 1907.

Treatises and compendiums on American insurance law published between 1894 to 1932 unequivocally establish that annuities-certain were traditionally granted by insurance companies and accepted as insurance business.[6]

Other legal and actuarial treatises and textbooks, antecedent to and contemporaneous with the enactment of the statutes we construe, reflect the general acceptance of annuities-certain as a common form of annuity in the insurance-related area of actuarial science.[7] One of these texts expressly describes annuities-certain as established insurance business.[8]

### (iv) Contemporaneous Insurance-law Treatises

Unequivocal recognition of annuities-certain as traditional insurance business during the period in question appears in the 1926 treatise Advanced Life

---

[6]See The Annual Cyclopedia of Insurance in the United States, 1894-1895, page 25; The Annual Cyclopedia of Insurance in the United States, 1909-1910 page 31; The Annual Cyclopedia of Insurance in the United States, 1922, page 239; Knight, Advanced Life Insurance (1926) pages 20-21; MacLean, Life Insurance (2d ed. 1929) page 62; Crobaugh, Handbook of Insurance (1931) pages 75, 77; Wright, Bible of Life Insurance (1932) page 60. See also Ellis, Law of Fire & Life Insurance and Annuities (1834) page 101.

We will quote from these historical texts to a greater and more cumulative extent than otherwise called for because, as we have found, they are rare and nearly inaccessible reference sources.

[7]See Wilkie, Theory of Interest (1794, England); Baily, Doctrine of Interest and Annuities (1808, England); Thatcher, Annuities For Fixed Periods (1825); Lumley, Law of Annuities [etc.] (1833, England); Todhunter, Actuaries Textbook (1901); Dawson, Practical Lessons in Actuarial Science (1905); 1 California Jurisprudence (1921) Annuities, section 1, pages 77-78; Proceedings of the Casualty Actuarial Society, 1926-1927; Avery, The Nature of an Annuity (1930); 2 California Jurisprudence (1921) Annuities, pages 77-80; 2 Ruling Case Law (1929) Annuities, section 1, page 2.

[8]Crobaugh, Annuities and Their Uses (1933); Fitch, Everything You Wanted to Know About Annuities (1934).

Insurance, *supra*.[9] Therein Professor Knight writes: "An annuity is a contract whose terms require *the insurance company* to pay a stipulated sum of money each year that one or more persons survive. The payments may be made annually, semi-annually, quarterly or monthly, and may continue throughout the life of the annuitant, *or during a fixed term of years. . . . If the payments are to be made for a certain period regardless of whether the annuitant survives or not, the contract is called an annuity certain. . . . Except in the case of annuities certain,* payments *by the company* cease with the death of the annuitant." (At pp. 20 and 21, italics added.)

Insurance annuities-certain are also discussed in the 1931 Handbook of Insurance, *supra*, at page 75.[10] "There are many varieties of annuities sold in this country, but all forms are either contingent or certain. Each kind is for the purpose of meeting the needs of the purchaser and is either in perpetuity or terminable. The following is a classification of the more important forms of annuities, with a brief explanation of each: (1) A *life annuity* is one where the payments are to continue for the whole life of the purchaser. [¶] (2) A *temporary life annuity* is one paid for a term of years, payments stopping at the prior death of one of the annuitants. [¶] (3) An *annuity certain* is one where payments are made at stated intervals *for a certain period*; *the death or survival of the annuitant makes no difference.* [¶] (4) An *annuity certain and continuous* is one that continues beyond a stipulated period, providing the annuitant survives the certain period." (Italics in original.) At page 77 the text again defines "annuity certain" as "A payment to one made at certain intervals during a specified time is an *annuity certain*. The *payments are not contingent on life or some other event.*" (First italics in original; second italics added.)

In another treatise, Annuities and Their Uses, *supra*, 1933, Mr. Crobaugh discusses the extensive sales of annuities by insurance companies as a regulated aspect of insurance business. Under the heading "Annuities Sold By Life Insurance Companies" he writes: "As we have previously indicated, since the latter part of the eighteenth century the handling of annuities has been gradually assumed by life insurance companies. At the present time in the United States the annuity business is almost exclusively carried on by life insurance companies." (At p. 25.) "An annuity contemplates the surrender of a definite sum of money to guarantee a series of periodic payments of a certain amount during the life of the annuitant *or for a certain period. . . . In present-day practice annuities, as well as life insurance, come under the*

[9]By Charles K. Knight, Ph.D., and Professor of Insurance, Wharton School of Finance and Commerce, University of Pennsylvania. At pages 20-21 under the heading "Other Types of Contracts—Annuities" within the chapter "Companies and Contracts."

[10]The author, Clyde J. Crobaugh, is described on the title page of the text as "Insurance consultant; Formerly Associated With the Aetna Life and Affiliated Companies."

*control and supervision of state insurance departments.*" (At p. 26. italics added.) The text defines "*Annuity-Certain*" as follows: "Where the series of fixed payments are to be continued at regular periodic intervals *only for a definite number of years, irrespective of any life contingency,* the annuity is known as an *annuity-certain.*" (At p. 32, italics added.)[11]

The 1932 insurance treatise, The Bible of Life Insurance,[12] defines an annuity-certain as "One payable for a fixed number of years for a fixed period of time, *irrespective of the survivance of any particular life or the happening of any contingency.*" (At p. 60, italics added.)

The earliest insurance law text which we have located that acknowledges annuities-certain as an aspect of insurance business is the 1894-1895 third edition of the Annual Cyclopedia of Insurance in the United States. (See, *ante,* fn. 1.) The text states, at page 25: "Annuities. Sums payable annually either for life *or a term of years.*" (Italics added.) The 1909-1910 edition of the Annual Cyclopedia, at page 31, contains the same definition.

The historical texts leave no doubt that annuities-certain were within the accepted definition of insurance annuities when section 101 and its predecessor were enacted. As mentioned (*ante,* fn. 3), the commissioner now concedes this point.

---

[11]The text, at page 32, is acknowledged by the commissioner as demonstrating that annuities-certain were an established form of life insurance business during the period when section 101 and former section 594 were enacted.

As we will discuss, *post,* part IB, the commissioner nevertheless maintains that the 1986 Muni-GICs do not come within section 101 because they do not conform to other traditional concepts of annuities-certain recognized prior to 1935. Specifically, the subject Muni-GICs issued in 1986 do not come within the historical criteria of annuities-certain because "traditional" insurance annuities-certain were restricted to individuals as annuitants and required fixed periodic payments of fixed, rather than variable sums.

Appellant, National Organization of Life and Health Insurance Guaranty Association (NOLHGA), provides a copy of page 32 of the text and cites to another part of page 32 discussing variations of life annuities. Curiously, NOLHGA ignores the text's immediately preceding discussion of "annuities-certain," which we have quoted and which the commissioner concedes to demonstrate that annuities-certain are included within section 101.

[12]Subtitled "Complete Photographic Reprint of the Original Studies and Official Reports of Elizur Wright 'The Father of Life Insurance [etc.],' " compiled for and copyrighted by The American Conservation Company, Chicago, Illinois; published by Recording and Statistical Corporation, Chicago.

The text credits Elizur Wright as the "father of life insurance" in the United States due to his reform efforts resulting in increased economic safeguards in that industry in the United States.

### (v) *Modern Secondary Sources*

#### (a.) *Post-1935 Industry Texts and Legal Treatises*

Modern insurance-law and actuarial texts continue to recognize annuities-certain as insurance annuities.[13]

#### (b.) *Insurance Industry Communications and Securities Exchange Commission Regulations*

Insurance industry statistics and communications and Securities and Exchange Commission releases after 1935 report that insurance companies traditionally granted annuities-certain as part of the business during the early part of this century.[14]

#### (c.) *The Parallel New York Statute*

It has been reported in a 1960 commentary that New York life insurance companies were authorized to grant and did grant annuities-certain under an 1853 New York statute (1853 N.Y. Laws, ch. 463, § 1, p. 887). (Johnson, *The Variable Annuity-Insurance, Investment or Both?*, *supra*, 48 Geo. L.J. 641, 654.)

It appears that the language in California's Act of 1866 (Stats. 1865-1866, ch. 546, § 1) was derived from the 1853 New York statute, *supra*. The 1853 New York statute authorized domestic life insurance companies to "make insurance upon the lives of individuals and every insurance appertaining

---

[13](McGill, Life Insurance (1967 rev. ed.) Annuities, ch. 6, p. 81; 1 Couch on Insurance (2d ed. 1984) § 1:20, p. 32; Donald, Compound Interest and Annuities-Certain (1953) The Valuation of Annuities-Certain, ch. 4, § 4.2, p. 41; 2 Cal. Insurance Law and Practice, *supra*, (Matthew Bender 1991) § 20.21[2][c], p. 20-37 ["An annuity certain makes periodic payments to the annuitant for a specified term without regard to the annuitant's actual life or death."].)

[14]Historical Statistics of Life Insurance, 1759-1958 (1960); Federal Securities Law Reporter Securities Act Release No. 6645 (1986-1987), (CCH), paragraph 84,004, at page 88,130 & footnote 11 (May 26, 1986); February 28, 1980 letter from American Council of Life Insurance to the Securities and Exchange Commission concerning applicability of the "section 3(a)(8) exemption under the Securities Exchange Act of 1933 to annuities-certain"; Federal Securities Law Reporter (CCH), Securities Act Release (1985) No. 33.6558, April 15, 1985, letter from the American Council of Life Insurance to the Securities and Exchange Commission commenting on proposed rule 151 concerning necessity of mortality risk assumption for insurance annuities; Johnson, *The Variable Annuity-Insurance, Investment or Both?*, (1960) 48 Geo. L.J. 641, 654.

thereto or connected therewith, and to grant, purchase or dispose of annuities." A similar New York statute enacted in 1909 confers similar authority. (1909 N.Y. Laws, ch. 33, § 70(1)).[15]

### (d.) *Other Post-1935 Secondary Sources*

Other post-1935 publications and insurance industry communications report annuities-certain as an established form of insurance annuity prior to 1935. (Fed. Securities L. Rep., *supra*, Securities Act Release No. 6645 ¶ 84,004, at p. 88,130 & fn. 11, February 28, 1980 letter by Paul J. Mason, Chief Counsel, Securities, of the American Council of Life Insurers, to the Securities Exchange Commission, at pp. 8-9.)

### (vi) *Present Statutes in Other States*

Further supporting the recognition of annuities-certain as insurance business, statutes of numerous states now explicitly define insurance annuities to include annuities-certain.

Eighteen states presently statutorily define insurance annuities explicitly to include annuities-certain.[16] Five states explicitly limit insurance annuities

---

[15]We have found no cases corroborating the derivation of the 1866 California statute or the granting of insurance annuities-certain in New York from 1853 through 1938. The New York statute was amended in 1939 to expressly delete annuities-certain from the business life insurance companies were authorized to conduct. (1939 N.Y. Laws, ch. 882, § 46.) California did not similarly amend section 101 to exclude annuities-certain from life insurance business in California.

The New York statute was again amended in 1985 to delete this limitation and expressly authorize insurance companies to grant annuities-certain. (1985 N.Y. Laws, ch. 864, § 1: N.Y. Ins. Law § 1113, subd. (a)(2) (McKinney 1985).)

[16](Ala. Code §§ 27-3-6 and 27-5-3 (1986); Conn. Gen. Stat. §§ 38a-432 and 38 a-1, subd. (3) (1991); Del. Code Ann. tit. 18, § 512, subd. (1) (1989); Ga. Code Ann. §§ 33-7-4 and 33-28-1(1) (1991); Ky. Rev. Stat. Ann. §§ 304.3-110 and 304.5-030 Banks-Baldwin (1988); Me. Rev. Stat. Ann. tit. 24-A, §§ 411, subd. (1) and 703 (1990); Minn. Stat. Ann. § 61B.03, subd. (3) (West 1990); Mo. Ann. Stat. § 376.010 (Vernon 1986); Neb. Rev. Stat. §§ 44-201, subds. (1), (3) (1988); Nev. Rev. Stat. Ann. §§ 680A.110 and 688A-020 (Michie 1991); N.D. Cent. Code §§ 17:17-1, subd. (c) and 17B:17-5 (1991); N.Y. Ins. Law § 1113, subd. (a)(2) (McKinney 1985); N.C. Gen. Stat. § 58-7-15, subd. (2)(1992); S.C. Code Ann. §§ 38-5-30, subd. (a) and 38-1-20, subd. (7) (1989 Lawyers Co-op); S.D. Codified Laws Ann. §§ 58-6-29 and 58-12-5 (1990); Vt. Stat. Ann. tit. 8, § 3717 (1984); Va. Code Ann. § 38.2-106 (1990); Wis. Stat. Ann. § 632.66 (West 1991 Supp.) [authorizing the Insurance Commissioner to promulgate rules authorizing insurance annuities without life contingencies].)

to life-annuities.[17] Twenty-one states, including California, provide no explicit inclusion or exclusion of annuities-certain as insurance business.

### (c) *Related Post-1935 California Statutes and Cases*

#### (i) *California Statutes*

Appellants cite to other provisions of the present Insurance Code and to post-1935 cases as direct indications that annuities-certain are not section 101 annuities. But these citations do not overcome the statutory construction of section 101 compelled by its structure and by the historical recognition of annuities-certain as insurance annuities.

■ Appellants contend section 10540 demonstrates that the Muni-GICs are not "authorized insurance" because the statute authorizes life insurance companies to "accept funds under an agreement which provides for accumulation of such funds for the purpose of purchasing annuities at future dates." Appellants contend that section 10540 does not recognize agreements such as Muni-GICs, because they do not involve a future purchase of an annuity, and thus the GICs are not recognized as insurance product.

But section 10540 does not purport to definitely fix or restrict the elements of annuities under section 101. Neither does it indicate that life insurers may not issue single-premium annuities-certain, whether immediate or deferred, having no connection to a human life. The statute merely places certain limitations on advance premium collection on life insurance policies and provides an exception for a type of group insurance product (apparently a predecessor of today's Pension-GIC) that includes a future annuity purchase option. (See 48 Ops.Cal.Atty.Gen. 17, 19 (1966).)

Appellants do not refute the apparent support lent to our reading of section 101 by the Standard Valuation Law. (§ 10489.6.) Section 10489.6 seems to contemplate that reserves on unallocated annuity and enhancement contracts need not have a connection to life because guaranteed benefits are to be determined by using the "mortality table, *if any*, . . ." (Italics added.)

#### (ii) *California Cases*

Appellants also rely upon *Estate of Barr, supra,* 104 Cal.App.2d 506, and *Equitable Life etc. Soc. v. Johnson, supra,* 53 Cal.App.2d 49, as "illustrative" of what a section 101 annuity is.

---

[17](Alaska Stat. § 21-12.055 (1990); Ariz. Rev. Stat. Ann. § 20-254.01 (1990); Md. Code art. 48A, § 65 (1991); Ore. Rev. Stat. Ann. § 731.154 (1987); Wyo. Stat. § 26-1-102, subd. (a)(iv) (1991).)

However, both *Barr, supra,* and *Equitable Life, supra,* determine the issue of inheritance tax liability rather than the status of an annuity as authorized insurance product. Neither case had occasion to consider the status of any form of annuity other than one having a connection to a human life. The status of annuities-certain was not at issue.

### B. *Section 101 Annuities Need Not Be Granted to Natural Persons and Have Inflexible Periodic Payments*

Conceding that annuities-certain were traditionally accepted forms of insurance business when section 101 and its predecessor were enacted, the commissioner argues that the 1986 Muni-GICs do not meet all the characteristics historically associated with insurance annuities-certain.[18]

■ The insurance commissioner's primary claim is that annuities-certain "have always concerned and related to individuals," while the 1986 Muni-GICs were issued to banks for the indirect benefit of municipal entities.

The insurance commissioner also argues that when section 101 was enacted, annuities-certain always involved payments of fixed sums at regular periodic intervals. He contends the 1986 Muni-GICs do not have these characteristics. Thus, the 1986 Muni-GICs are not traditional insurance annuities-certain contemplated by section 101.

Finally, the commissioner contends that the Muni-GICs lack other elements essential to insurance annuities.

### 1. *Natural Persons as Annuitants*

The answer to the insurance commissioner's first contention is that no criterion that the purchaser or annuitant be a natural person was imposed upon insurance annuities-certain in any of the early statutes, texts or reported cases. While acknowledgments in the early texts and cases that annuities-certain were accepted life insurance business establishes that historical fact, the citation of certain texts that discuss annuities only in the context of natural persons as annuitants or are silent as to the class of purchasers does not demonstrate that annuities-certain were not or could not be granted to other annuitants. As it has been shown that insurance annuities were historically not restricted to those "appertaining to lives of persons," there is no reason to conclude that they could be granted only to persons. Pragmatically, a business corporation or a trust could benefit from an annuity-certain to meet periodic financial needs in the same manner as a person.

---

[18]The commissioner initially contended that "insurance annuities" must "have a relationship to a human life." He now contends only that "insurance annuities" must have a human annuitant, even if the annuity has no connection to the annuitant's life. (See fn. 11, *ante.*)

The commissioner's argument is further undermined by an early English treatise. A Treatise Upon the Law of Annuities [etc.], *supra*, at page 52, discusses the entitlement of persons to take grants of annuities under the English common and statutory law. Under the margin heading "Who may be grant*ees* of rents and annuities. 1. Corporations," the text states: ". . . Thus, attending first, as before, to *corporate persons*; *they have the power to take grants of annuities*, or rents under the limitations imposed by the statutes of mortmain." (Italics added.)

Even if annuities-certain had not been issued to annuitants other than natural persons prior to 1935, the insurance status of Muni-GICs under section 101 would not be affected.

In *S. E. C. v. Variable Annuity Co.* (1959) 359 U.S. 65 [3 L.Ed.2d 640, 79 S.Ct. 618], the United States Supreme Court considered whether certain variable life annuities, which did not guarantee any minimum periodic payment, were insurance products qualifying for exemption from federal securities regulation. The Supreme Court held that the variable annuities involved did not qualify for exception. They did not guarantee any payments at all and, thus, the insurer did not assume any investment risk, which is a fundamental, historical difference between a security and an insurance product. The court observed: "We realize that life insurance is an evolving institution. Common knowledge tells us that the forms have greatly changed even in a generation. And we would not undertake to freeze the concepts of 'insurance' or 'annuity' into the mold they fitted when these Federal Acts [Securities Exchange Act of 1933] were passed. But we conclude the concept of 'insurance' includes some investment risk-taking on the part of the company." (At p. 71 [3 L.Ed.2d at p. 644].) In our view, the theoretical, particular market to which insurance annuities-certain might have been limited prior to 1935 is not a fundamental, immutable characteristic of the insurance product.

### 2. *Flexible Payment Annuities*

 While the 1986 Muni-GICs do have aspects that give the annuitant more flexibility as to payments than a standard fixed-payment annuity, the variations are not of such nature as to vitiate their qualification as insurance annuities-certain under section 101.

There is no serious dispute here that the subject Muni-GICs guarantee stipulated periodic payments whereby the insurers assume the traditional insurance-product investment risk found critical in S.E.C. v. *Variable Annuity Co.*, *supra*, 359 U.S. 65. Thus, they are not variable annuities. They are,

rather "flexible" fixed annuities that guarantee regular, periodic payments in amounts fixed by the accumulated "fund value." (See 2 Cal. Insurance Law & Practice, *supra*, Types of Life Insurance, §§ 20.21[5][a], [b] and [c], p. 20-40 et seq.) The Muni-GICs vary from the traditional "fixed" annuity in that they give the owner the option to request a periodic payment smaller than the guaranteed amount. The unpaid portion of the guaranteed amount remains in the "fund value" and accumulates interest. The Muni-GIC provisions allowing limited annual withdrawals in addition to the semiannual periodic payments do potentially increase the total payments for a given year. But in our view this is a minor variation of the fixed annuity-certain that does not affect its qualification as an insurance annuity.

Again, as pointed out in *S.E.C. v. Variable Annuity Co.*, *supra*, 359 U.S. at pages 69-71 [3 L.Ed.2d at pages 643-645], insurance annuities are a product that evolved according to changing economic conditions. Variations from historic "molds" do not vitiate the insurance nature of the product so long as it retains the fundamental risk-transfer element of insurance and the essential characteristics of an annuity.

We note that the insurance commissioner's new argument is inconsistent with his earlier acknowledgement of the insurance-annuity status of structured-settlement annuities. Such annuities provide for flexible periodic payments keyed to the changing needs of the annuitant.

For these reasons, we conclude that the "traditional characteristics" argument suggested by the commissioner is historically and analytically unsupported.

Having concluded that the subject Muni-GIC contracts qualified as insurance annuities-certain under section 101 when granted in 1986, we turn to address appellants' remaining contentions.

### 3. *Other Criteria for Insurance Annuities-certain*

The commissioner also disputes whether the Muni-GICs have all the other essential elements of insurance annuities-certain.

This issue derives from case law requiring insurance annuities to exhibit certain fundamental characteristics of insurance. As already discussed, *S. E. C. v. Variable Annuity Co.*, *supra*, 359 U.S. at pages 71-73 [3 L.Ed.2d at pages 644-646], holds that variable annuities are not insurance for purposes of qualifying for exemption from the Federal Securities Act of 1933 because they did not exhibit the "risk assumption" deemed historically fundamental

to insurance product. In *Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 654 [186 Cal.Rptr. 578, 652 P.2d 426], our Supreme Court construed section 22 as imposing both (1) the requirement of a shifting of "risk of loss" from the insurance purchaser to the insurance company, and (2) "distribution of risk among similarly situated persons" (other purchasers of insurance product).

In this regard it is recognized that annuities, by definition (e.g., § 22) and function, do not have the fundamental insurance characteristic of "indemnification of loss, damage, or liability arising from a contingent or unknown event." Thus, annuities are not considered insurance product unless deemed to be such by state law (e.g., § 101). (1 Appleman, Insurance Law and Practice, *supra*, Annuities, § 84, p. 295; *S. E. C. v. Variable Annuity Co.*, *supra*, 359 U.S. at p. 69 [3 L.Ed.2d at pp. 643-644].) Given that section 101 includes annuities-certain within the "life insurance" classification, the question is whether the 1986 Muni-GICs have all the essential characteristics (other than indemnification) of insurance annuities-certain.

### (a) *Risk-shifting and Distribution of Risk*

At trial, respondents adduced expert testimony from three actuaries with extensive experience as executives or chief actuarial officers for life insurance companies. The experts expressed the uniform opinion as to the insurance industry practice, based upon leading industry treatises and texts, that the 1986 Muni-GICs are within the insurance and actuarial industries' accepted definition of insurance annuities-certain. More specifically, they agreed that insurance annuities need not have a mortality risk (i.e., have a connection to human life) and that they transfer and spread investment risk and other risks in the manner of insurance.

Plaintiffs also adduced deposition testimony by the commissioner's designated expert who agreed with this conclusion (with the reservation that permitting the amount of the periodic payments to be varied by the annuitant renders the GICs "modified annuities-certain") but who was not called to testify at trial.

Appellants produced no experts at trial to give contrary opinions. Neither did appellants significantly discredit the opinions of respondents' experts on cross-examination.

The insurance commissioner urges that the expert testimony is incompetent as to California law and misapplies a general financial definition of annuity to the insurance area. However, we consider the expert

testimony as competent evidence only of accepted insurance industry practice, not as defining what an insurance annuity is under the law of a particular state. The expert testimony is competent to establish whether a particular contract meets particular industry criteria and to establish the meaning of technical terms used in insurance industry practice. The technical or commercial meaning of a term is cognizable in construing a statute employing such term. (2B Sutherland, Statutory Construction, *supra*, § 47.31, pp. 266-267.)

Respondents' three actuarial experts testified as follows:

The 1986 Muni-GICs are annuities-certain and meet the accepted insurance industry understanding of insurance annuity. This definition is substantially identical to that stated in the texts, quoted above at footnote 13. Specifically, an insurance annuity need not be contingent on the continuance of a human life.

Many accepted forms of insurance annuities have no mortality risk (connection with human life). Examples are lottery annuities and structured settlement annuities. Two of the experts see support for this view in section 10489.6 (Standard Valuation Law), which requires that the reserving methodology for unallocated annuities (annuities not having an individual annuitant or derivatively benefiting an individual) shall include "mortality risk, *if any*." (Italics added.)

The experts concluded that the 1986 Muni-GICs exhibit all the necessary elements of insurance annuities. They involve a single premium and the accumulation of money for guaranteed payments subject to variation at the annuitant's election over a period of time. Investment risk is transferred from the purchaser to the insurer and spread among the broader base of all the insurer's policyholders.

Insurance annuities do not require an option for future purchase of an annuity.

Insurance annuities need not provide for periodic payment of principal as well as interest.

The Muni-GICs shift the three typical insurance risks ("investment risk," "market value risk" and "default risk") to the insurance company.

Insurance annuities need not be issued to an individual annuitant. Many insurance policies are issued to corporations or organizations in the form of "key man" policies, such as those on professional athletes, that benefit the corporation rather than the person whose life or health is indemnified.

Michael Koehn, a financial economist, testified that the 9 percent guaranteed interest rate, at which some of the 1986 Muni-GICs were sold, indicates that the contract price and market perception were premised on the contracts being insurance product backed by ELIC's insurance reserves and entitled to liquidation priority over ordinary business debts. At their 9 percent interest rate, the Muni-GICs were not competitive on a "risk-vs.-yield" ratio with noninsurance investments giving significantly higher rates of return in 1986. In his opinion, the Muni-GICs and typical Pension-GICs performed essentially the same risk-shifting insurance function.

As mentioned, appellants did not adduce any experts at trial. The insurance commissioner's designated trial expert, Mr. Stanley B. Tulin, was not called. But at his deposition Mr. Tulin stated his opinion that the Muni-GICs conformed to his actuarial understanding of an insurance annuity except that they required that withdrawals be requested rather than providing for automatic periodic payments. On this basis Mr. Tulin characterized the Muni-GICs as "modified annuities-certain." Mr. Tulin agreed that the term annuities as used in the insurance industry includes annuities not involving life contingencies; that the Muni-GICs shift investment risk, interest risk and default risk, like insurance, and that annuities-certain without life contingencies are common in the life insurance industry. When the commissioner did not call his expert at trial, respondents designated excerpts from the deposition of Mr. Tulin as evidence at trial.[19]

### (b) *Assignability*

The sole aspect of the 1986 ELIC Muni-GICs not consistent with the experts' understanding of insurance annuities is the provision in some of the investment agreements permitting ELIC to assign the contract to a company not authorized to transact insurance business.

The record does not disclose why some of the Muni-GIC investment agreements contain such assignment provisions and others do not.

Appellants contend that such transfer provisions demonstrate that the contracts were not intended to be insurance but, rather, "purely investment vehicles."

---

[19] The commissioner now asks that other portions of the Tulin deposition be judicially recognized to refute respondents' erroneous claim that the commissioner elected not to call Mr. Tulin at trial because Mr. Tulin's deposition testimony flatly contradicts the commissioner's position. The request for judicial notice is inappropriate. The commissioner could have elected to put Mr. Tulin on the witness stand at trial to reveal his views fully. The present record is sufficient to evaluate Mr. Tulin's position as to the insurance status of the Muni-GICs. The commissioner's motive for omitting to call Mr. Tulin is not material to the issues presented. We do note, however, that the commissioner failed to include the designated excerpts of the Tulin deposition, which had been introduced at trial, in the appellate record.

However, appellants do not, nor could they, contend there is no substantial evidence to support the trial court's finding that the Muni-GICs were intended to be and were sold as insurance product.

The record demonstrates that ELIC officers intended and believed the Muni-GICs to be insurance annuities. ELIC counsel represented to certain purchasers in 1986 that the Muni-GICs were policies within the meaning of section 101 and, specifically, would have "policyholder" status if a liquidation were to occur. The record also reflects that ELIC maintained that the GICs were authorized insurance annuities in 1986 when the Department announced its contrary opinion. Both ELIC and the Department of Corporations treated the GICs as insurance annuities for annual reserve accounting purposes as of 1986.

Moreover, the Muni-GIC investment agreements all contain an "invalidity" clause providing that "The invalidity or unenforceability [sic] of any particular provision of this Agreement or the Funding Contract shall not affect the other provisions, and this Agreement and the Funding Contract shall be construed in all respects as if such invalid or unenforceable [sic] provision was omitted."

By operation of the invalidity clause, the portion of the assignment provision authorizing assignment by ELIC to noninsurers must be disregarded as unlawful and not enforceable. The contracted provision permitting assignment to an entity other than a licensed insurer is not such an essential aspect of the contracts that its removal precludes enforcement of the remaining lawful contractual provisions. The inconsistent assignment language is not shown to be an essential aspect of consideration given or due to any party. (*Labor Board* v. *Rockaway News Co.* (1953) 345 U.S. 71, 78-81 [97 L.Ed. 832, 783-840, 3 S.Ct. 519]; cf. *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 821 [258 Cal.Rptr. 161, 771 P.2d 1247].)

## II

### RETROACTIVE APPLICATION OF SECTION 10541

We turn now to a discussion of why section 10541, effective January 1, 1989, has no retroactive application to the insurance status of the 1986 Muni-GICs.

As we have discussed in part I, *ante,* the 1986 Muni-GICs were "life insurance" within the meaning of section 101. Appellants argue that if the Muni-GICs were insurance annuities when issued in 1986, section

10541 retroactively reclassified them as noninsurance "funding agreements," at least for purposes of section 1033 liquidation priority. Appellants devote a significant portion of their briefs to the contention that this retroactive application would not effect an unconstitutional impairment of any "vested" contract right to liquidation priority.

But, as pointed out by respondents, the threshold issue is whether section 10541 was intended to affect the status or validity of previously issued Muni-GICs.

The presumption is that statutes are to be prospective where no indication of retroactive intent is manifested. " 'The principle that statutes operate prospectively, while judicial decisions operate retrospectively, is familiar to every law student. [Citations.] This court has often pointed out: "[T]he first rule of construction is that legislation must be considered as addressed to the future, not to the past. . . . The rule has been expressed in varying degrees of strength but always one of import, that a retrospective operation will not be given to a statute which interferes with antecedent rights . . . unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.' " [Citation.]' " (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1207 [246 Cal.Rptr. 629, 753 P.2d 585], italics omitted, quoting *United States* v. *Security Industrial Bank* (1982) 459 U.S. 70, 79-80 [74 L.Ed.2d 235, 243-244, 103 S.Ct. 407].)

The legislative history of section 10541 provided in the record contains no affirmative indication that section 10541 was intended to affect previously issued Muni-GICs in any respect. There is no "grandfather" clause authorizing funding agreements issued and delivered prior to the statute's effective date.

As will be shown, the legislation was proposed by the Association of California Life Insurance Companies and individual California life insurance companies for the purpose of enabling their future sale of Muni-GICs in a booming market under the most competitive circumstances.

The three primary purposes reflected in the legislative history of section 10541 (Sen. Bill No. 901 (1987-1988 Reg. Sess.) were (1) avoidance of the insurance premium tax, (2) avoidance of security status under the Securities Exchange Act, and (3) avoidance of "covered claim" status under the California Insurance Guarantee Act.

The legislative history reveals that three salient points were consistently made in committee reports and in the sponsor's letter to the Governor. First,

that existing law does not grant *specific* authority for insurers to issue funding agreements. Such agreements contain features "substantially identical" to those in insurance annuities but are not based on life contingencies. Second, the absence of an express authorization in California law for insurers to sell funding contracts places them at a competitive disadvantage in this "attractive and significant market in California." Third (integrally related to the second point), funding agreements were not to be insurance business, so as to avoid the gross premium tax and allow premiums to be taxed under the Bank and Corporation Tax Law applicable to products being marketed by banks. (Enrolled Bill Rep., Sept. 2, 1988, Sen. Bill No. 901 (1987-1988 Reg. Sess.) pp. 1-3; Sen. Rules Com., Sen. floor analysis of Sen. Bill No. 901 (1987-1988 Reg.Sess.) Apr. 27, 1987; Aug. 28, 1988, letter from sponsor Sen. Newton Russell to Governor.)

It is manifest that the proposed legislation was intended exclusively as an enabling statute opening the market for California life insurers, to give them competitive ability in that market.

Neither the statute nor its legislative history mentions that Muni-GICs or funding agreements had been issued by a California insurer. Nowhere in the statute or its legislative history is there an indication of an intent to retroactively authorize previously issued Muni-GICs or to affect the status thereof.

The conclusion must be drawn that section 10541 was not intended to have retroactive application to the 1986 Muni-GICs. We need not address the issue of the constitutionality of a retroactive application of the statute.

## III

### SECTION 1019

Appellants contend that irrespective of the question of direct retrospective application of section 10541, the statute operates indirectly through section 1019 to fix claimant priorities as of the date the liquidation order or conservatorship order is filed. Appellants reason that section 1019 fixes the priority of claims under section 1033 as governed by laws in effect at the date the liquidation or conservatorship order is filed. Thus, section 10541 (enacted 1988) was in effect as of April 11, 1991, and controls the section 1033 priority of the 1986 Muni-GICs in this liquidation.

We reject this theory.

The legislative history of section 1033 and the recognized function of section 1019 in the claims-fixing scheme belie the construction urged by appellants.

As we will demonstrate, section 1033, as it read upon enactment in 1935, allowed no such priority-fixing function for section 1019. Also, a reading of sections 1019 through 1033 strongly suggests that the term "rights and liabilities" as used in section 1019 was intended exclusively to fix rights as between creditors and the insolvent estate, not to fix claim priorities vis-à-vis creditors under section 1033. The term has never been construed in the manner suggested by appellants. Finally, the only class of statutes recognized by California cases to set liquidation claim priorities, other than section 1033 itself, are statutes which expressly create claim priorities under subdivision (a)(4) of section 1033 and which are expressly acknowledged therein.

Section 1019 provides: "Upon the issuance of an order of liquidation under section 1016, the rights and liabilities of any such person [the insolvent insurer] and of creditors, policyholders, shareholders and members, and all other persons interested in its assets, including the State of California, shall, unless otherwise directed by the court, be fixed as of the date of the entry of the order . . . ."

The crux of appellants' argument is that section 1019 uses the phrase "all rights and liabilities" to include claimant "priority rights" under section 1033. Thus, section 1019 not only sets the date on which claims against the insolvent must exist to be allowable; it also requires that "priority rights" under section 1033 be determined exclusively by laws existing as of that date.

In the present context, this would mean that even if respondents were "policyholders" under section 101 when they purchased ELIC Muni-GICs in 1986, their section 1033 claimant priority status is now determined by the subsequently enacted section 10541 in effect when the April 11, 1991, conservation order was filed. Section 10541 has provided since 1989 that contracts with the characteristics of Muni-GICs are noninsurance funding agreements (priority 6) rather than insurance annuities (priority 5).

A. *Legislative History*

Appellants' statutory construction is premised upon the six "allowed claims" priority classes specified in section 1033 since 1979. But appellants fail to reconcile their construction of section 1019 with section 1033 as it read when enacted in 1935.

Sections 1019 and 1033 were enacted in 1935 in a major revision of the laws controlling insurer insolvency proceedings.

From its enactment until 1972 (Stats. 1972, ch. 1217, p. 2353) section 1033 provided for only three classes of "allowed claims" priorities: "(1) Expense of administration; (2) Claims having preference by the laws of the United States and by the laws . . . of this State; (3) All other claims." (Stats. 1935, ch. 145, p. 545.)

These three priorities were self-defined and mutually exclusive. Claims qualified under the first priority exclusively by reason of being incurred as administrative costs. Claims qualified for second priority only if other statutes expressly conferred priority in liquidation to the type of claim. All other claims (which included policyholders, unearned premium claimants, and all other creditors) had the same third (last) priority.

Thus, in 1935 there was no possibility the Legislature intended section 1019 to function, *via* other statutes, to fix claim priorities as between claimants in the then monolithic "all other claims" class 3.

From 1935 through 1972 all the claimants in present classes 5 and 6 continued to share the same "all other claims" last priority. It was not until 1979, when the insurance insolvency statutes were amended to conform to revised federal bankruptcy law, that the present priority 5 and priority 6 claimants were specified. (*Kinder* v. *Superior Court* (1981) 125 Cal.App.3d 308, 315 [178 Cal.Rptr. 57]; Stats. 1979, ch. 384, § 1, p. 1445.) This was the first time that section 1019 could even theoretically perform the function attributed to it by appellants.

But nothing in the 1979 amendment of section 1033 suggests a legislative intent to create a new function for section 1019 to facilitate classification of particular allowed claims as between priorities 5 and 6. Section 1033 retained as "priority 4" those claims expressly given priority by other statutes.

## B. *Statutory Language*

### 1. *"Rights and Liabilities"*

The term "rights and liabilities" as used in section 1019 is admittedly broad and not expressly defined. But the focus of the statute does not go beyond determination of which claims may be allowed against the liquidation estate if they are timely filed and proven. This limited function is evident when section 1019 is considered together with sections 1025, 1026, 1027, and 1031.

Section 1019 is acknowledged as the statute fixing the general rule for determination of allowable claims. It fixes rights and liabilities as between

the insolvent and its creditors as of the date the liquidation order is filed "unless otherwise directed by the court." The quoted qualifying phrase has been construed as leaving discretion in courts to *allow* unliquidated claims that might mature or become capable of calculation *after* the date of the liquidation order. Such claims may be allowed claims if they mature within the six-month period for filing claims under section 1025. If such a liquidated claim does timely mature and is determined to be an "allowed claim," its priority is determined under section 1033. (*Carpenter* v. *Coast Surety Corp.* (1938) 25 Cal.App.2d 209, 211-212 [77 P.2d 294].)

Section 1031 is consistent with section 1019 in determining allowable set-offs of mutual debts as between the insolvent and its creditors. These substantive rights vis-à-vis creditor and debtor are subject to the "fixing" provisions of sections 1019 and 1031, subdivision. (a). (*Downey* v. *Humphreys* (1951) 102 Cal.App.2d 323, 331, 337 [227 P.2d 484].)

In contrast to section 1019, section 1033 deals exclusively with the priority of "claims allowed." As mentioned, it expressly acknowledges claim priorities created by other statutes under priority 4. Section 1033 expresses no parallel function for section 1019 to classify claims as between priorities 5 and 6. Had the Legislature intended section 1019 also to control claim priorities via section 1033, we expect it would have expressly done so by including the term "priorities" in section 1019 or by making express provision in section 1033.

All the cases arising under section 1019 concern the determination whether particular claims exist at the time a liquidation order is filed and thus may be allowed. (*Carpenter* v. *Coast Surety Corp.*, *supra*, 25 Cal.App.2d at pp. 211-212; *Downey* v. *Humphreys*, *supra*, 102 Cal.App.2d at pp. 331, 337; *Mitchell* v. *Pacific Greyhound Lines* (1939) 33 Cal.App.2d 53, 68-69 [91 P.2d 176]; *Kinder* v. *Superior Court*, *supra*, 125 Cal.App.3d 308.) Appellants cite no case, and independent research has revealed no case, indicating section 1019 may serve the function attributed to it by appellants.

2. *"Claims Given Preference By Laws"*

The preference recognized in subdivision (a)(4) of section 1033 (claims given preference by the laws of the United States and the laws of California) has been applied by cases only to statutes that expressly provide for claim priority in insolvency proceedings. These preferential claims include wage claims, workers' compensation claims, and claims by the United States government involving government assets. (11 U.S.C. § 104; Code Civ. Proc., § 1204; Lab. Code, § 4908; 31 U.S.C. § 3713; 12 U.S.C. § 1456(a); 39

U.S.C. § 401(9); *Kinder* v. *Superior Court, supra,* 125 Cal.App.3d at pp. 313, 315; *Caminetti* v. *Guaranty Union Life Ins. Co.* (1943) 22 Cal.2d 759 [141 P.2d 423]; *Federal Home Loan Mortgage Corp.* v. *Superior Court* (1990) 224 Cal.App.3d 218, 221, 222-223 [273 Cal.Rptr. 531]; *In re Interstate Indem. Co.* (1963) 219 Cal.App.2d 809, 815-816 [33 Cal.Rptr. 418].)

### C. *Appellants' Authorities*

Appellants have cited no cases, and we have found none, suggesting that section 1019 requires section 1033 claim priorities to be determined by statutes that do not expressly create liquidation claim priorities.

Appellants rely upon out-of-state decisions for the proposition that statutes may be applied to reorder "vested" claimant priorities although the statute was enacted after the transactions underlying the claims and after the date the liquidation order was filed.

These cases are inapposite. They concern pendente lite amendments to insurance insolvency statutes that directly determine claim priorities (analogous of our § 1033) or statutes that expressly provide for claim priority.[20]

## IV

### CONCLUSION

The 1986 Muni-GICs are insurance annuities within the meaning of section 101 and this status is not altered by retroactive application of section 10541 or by operation of section 1019.

We need not, and do not, reach the remaining issues raised by the parties.

The judgment entered June 11, 1992, is affirmed to the extent it determines the 1986 Muni-GICs owners are entitled to class-5 priority as "policyholders."

---

[20]Appellants' case authorities re application of section 1019 to render section 10541 determinative of liquidation claim priorities:

*Maryland Ins. Guaranty Ass'n* v. *Muhl* (1986) 66 Md.App. 359 [504 A.2d 637]; *Louisiana Insurance Guaranty Ass'n* v. *Guglielmo* (La. Ct. App. 1973) 276 So.2d 720; *Hamberg* v. *Guaranteed Mortg. Co. of New York* (1942) 180 Misc. 276 [38 N.Y.S.2d 165]; *People* ex rel. *Baylor* v. *Bell Mutual Casualty Co.* (1973) 54 Ill.2d 433 [298 N.E.2d 167]; *Kinder* v. *Superior Court, supra,* 125 Cal.App.3d 308.

The temporary stay issued by the Supreme Court upon its transfer of the petition to this court shall remain in effect until the time for filing a petition for review has run.

Epstein, J., and Taylor, J.,* concurred.

The petitions of all appellants for review by the Supreme Court were denied January 28, 1993. Mosk, J., and Kennard, J., were of the opinion that the petitions should be granted.

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.